IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIDSHIPMEN LANCE BARNES,                    )
PETER BARBOUR, JASON BERGER,               )
JOEL N. BARTIS, MARK D. BORAN,             )
DAVID A. CHLEBNIK, CHRISTOPHER             )
CLAIBORNE, JEFFREY D. CLARK,               )
DANIEL COLPO, JAMES NIXON SHERROD,         )    C.A. No.: ____94 0261____
DAVID J. DERMODY, GARRY M.                 )
DEVINGER, SETH EVANS, JOHN                 )
FORMOSO, HENRY FULTON III,                 )
ROBERT E.F. GENTRY, MATTHEW                )              
GIBSON, BRIAN D. GRAVES, DAVID E.          )         GREENE, J. HHG
GWINN, JEFFREY GANTAR, KEVIN P.            )
HAMILTON, KEVIN W. HAVENS,                 )
JUSTIN JONES-LANTZY, JASON                 )
HEDBERG, DUNCAN N. INGRAHAM, JR.,          )             FILED
NEIL P. KEEGAN, PAUL R. KOCHER,            )
CHRISTOPHER KUZNIEWSKI,                    )           FEB 10 1994
D. WILSON MARKS, ERIC P.                   )
MITCHELL, COLIN M. O'BRIEN,                )       CLERK, U.S. DISTRICT COURT
EDWARD O'NEILL, ANDREW PAYNE,              )          DISTRICT OF COLUMBIA
DANIEL PIDGEON, TIMOTHY J. QUEEN,          )
SEAN W. QUINN, THOMAS ROSZKO,              )
STEVEN E. SCHAIRER, MARK E.                )
SCHNEIDER, BLAIR SOKOL,                    )
LEWIS B. SIMS, ANDREW SOTERAKIS,           )
DERRICK TEFF, JEFFREY STEPANIC,            )
DAVID B. STOWERS, BRYAN SZELIGA,           )
JASON VAN MATRE, and                       )
JAVIER ZULUAGA, USN                        )
                                           )
Bancroft Hall                              )
United States Naval Academy                )
Annapolis, Maryland 21412                  )
                                           )
            Plaintiffs,                     )
     v.                                    )
                                           )
HONORABLE JOHN DALTON                      )
Secretary of the Navy                      )
The Pentagon                               )
Washington, D.C. 20301                     )
                                           )
     and                                   )
                                           )
                                           )
ADMIRAL FRANK B. KELSO, USN                )
Chief of Naval Operations                  )
The Pentagon                               )
Washington, D.C. 20301                     )

```
                                    )
        and                         )
                                    )
REAR ADMIRAL THOMAS C. LYNCH, USN   )
Superintendent                      )
United States Naval Academy         )
121 Blake Road                      )
Annapolis, Maryland 21402           )
                                    )
        and                         )
                                    )
REAR ADMIRAL RICHARD ALLEN, USN     )
c/o Superintendent                  )
United States Naval Academy         )
Annapolis, Maryland                 )
                                    )
            Defendants.             )
_____    )
```

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This Complaint seeks to enjoin a so-called Honor Review Board, a procedure without statutory or regulatory warrant, that the Navy has purported to substitute for the hearing process that otherwise would determine whether the plaintiffs should be dismissed from the United States Naval Academy as a result of the highly publicized allegations of cheating on an examination. This novel procedure, a "coin minted for a special occasion," devised under pressure from the Congress, has been accompanied by serious violations of the rights of the plaintiffs that threatens irreparable injury to their reputations and careers.

Plaintiffs, through undersigned counsel, for their complaint against defendants, the Secretary of the Navy, the Chief of Naval Operations, the Superintendent of the United States Naval Academy and the President of an Honor Review Board

appointed by the defendant Chief of Naval Operations, respectively, state as follows:

### JURISDICTION AND VENUE

1.     Subject-matter jurisdiction for this action exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1361.  Plaintiffs seek a declaratory judgment and an injunction to prevent defendants from proceeding with scheduled administrative hearings convened to determine whether the plaintiffs should be recommended for dismissal from the United States Naval Academy. Plaintiffs' claims are based on defendants' violations of statutory and constitutional limits upon their power and intentional violations of the plaintiffs' rights under Article 31 UCMJ, 10 U.S.C. 831, as well as the United States Constitution.

2.     Venue in the District for the District of Columbia is proper pursuant to 28 U.S.C. § 1391(e).

### PARTIES

3.     Plaintiffs are midshipmen at the United States Naval Academy who are scheduled to graduate and be commissioned in May 1994.  Each of the plaintiffs was enrolled as a midshipman at the United States Naval Academy on July 3, 1990 and have remained enrolled there since.

4.     Pursuant to 10 U.S.C. 802(a)(2), each of the plaintiffs is subject to the Uniform Code of Military Justice, 10 U.S.C. 801, et seq.

5.    Defendant John Dalton is the Secretary of the Navy.

6.    Defendant Admiral Frank B. Kelso USN is the Chief of Naval Operations.

7.    Defendant Rear Admiral Thomas C. Lynch USN is the Superintendent, United States Naval Academy.

8.    Rear Admiral Richard C. Allen USN is an officer on active duty in the United States Navy.  On January 24, 1994, he was appointed by Admiral Frank B. Kelso USN to preside over a Board of Officers  (the "Allen Review Board") to consider midshipmen honor cases arising out of the alleged compromise of the 1992 Electrical Engineering 311 ("EE 311") semester final examination.

## BACKGROUND

9.    Plaintiffs are all members of the Class of 1994 at the United States Naval Academy.  During academic year 1992-93, their "Second Class" or "Junior" year, plaintiffs were enrolled in Electrical Engineering 311, a core (mandatory) course for all non-engineering majors.

10.   Plaintiffs were among 663 midshipmen of the Class of 1994 who took the Electrical Engineering 311 course examination at 7:45 a.m. on December 14, 1992.

11.   Prior to the administration of the EE 311 examination, some members of the Electrical Engineering Department became aware that an EE 311 examination had been

- 4 -

misplaced, however, this report was not investigated by the Naval Academy administration.

12.  Shortly after the completion of the EE 311 examination, a Naval Academy faculty member was advised by a midshipman that the EE 311 examination had been compromised.

13.  On December 15, 1992, the Academic Dean of the United States Naval Academy, Dr. Robert Shapiro, informed defendant Rear Admiral Lynch of the reports of the exam compromise.  Rear Admiral Lynch directed Dr. Shapiro to ask the Electrical Engineering Department faculty to determine whether the test results showed any evidence of cheating.

14.  On December 16, 1992, Dr. Shapiro reported to Rear Admiral Lynch that the Electrical Engineering Department faculty found no patterns or inexplicable spikes in the individual grades indicative of wide-spread cheating on the EE 311 examination.

## Naval Criminal Investigation Service Investigation

15.  Rear Admiral Lynch met with investigators of the Naval Criminal Investigative Service ("NCIS") on December 16, 1992.  The Naval Criminal Investigative Service investigates allegations of criminal activity by Navy personnel or criminal activity on board naval installations.

16.  During the meeting with NCIS investigators, Rear Admiral Lynch expressed concern that there might have been criminal conduct, including both theft and breaking and entering, involved in the EE 311 exam compromise.

17.  On December 16, 1992, Rear Admiral Lynch directed NCIS investigators to investigate the compromise.

18.  As directed, NCIS investigated the compromise. NCIS investigators interviewed midshipmen, including plaintiffs, prefacing their questioning with the warnings required by Article 31, UCMJ, 10 U.S.C. § 831 (i.e., the right to remain silent). NCIS agents typically warned the midshipmen they interviewed that the midshipmen were suspected of the offenses of:  Conduct Unbecoming an Officer, Larceny, Receiving Stolen Property, Concealing Stolen Property, or a combination thereof.

19.  Conduct Unbecoming an Officer, Larceny, Receiving Stolen Property and Concealing Stolen Property are violations of the Uniform Code of Military Justice, punishable at trial by general court-martial.  The maximum punishment for these offenses includes confinement at hard labor, forfeiture of all pay and allowances and a dishonorable discharge.

20.  Cheating on an examination constitutes a violation of the UCMJ, Article 133, and is punishable at court-martial. The maximum punishment for cheating in violation of Article 133 UCMJ is confinement for one year, forfeiture of all pay and allowances and a dismissal from the Naval Service.

21.  During the course of their investigation, NCIS investigators discovered information indicating that the EE 311 examination had been compromised.  NCIS attempted to identify the source of the compromise, but was unable to do so.

22.   Upon being advised of their Article 31 UCMJ, 10 U.S.C. § 831 right by NCIS investigators, many midshipmen exercised their right to remain silent and refused to answer questions or cooperate further with the investigators.

23.   NCIS' investigation was substantially completed by mid-January 1993.

24.   On February 4, 1993, an NCIS investigator held a briefing on the results of the NCIS investigation.  Present at the meeting were Captain Nick DeCarlo USN, the Staff Judge Advocate to the Superintendent of the Naval Academy,; Lieutenant Commander ("LCDR") Timothy Nagle, Staff Judge Advocate (lawyer) to the Commandant of Midshipmen; Lieutenant ("LT") Thomas Cann, Ethics Advisor to the Commandant of Midshipmen; and Midshipman Cory Culver, Honor Committee Chairman.

25.   NCIS investigators identified to the Naval Academy administration 39 midshipmen whom they believed possessed some or all of the EE 311 examination before it was administered.

26.   After the NCIS briefing, Captain DeCarlo recommended to Rear Admiral Lynch that he consider court-martial proceedings for one or two of the midshipmen identified by NCIS.

27.   LT Cann determined that there was sufficient evidence to charge 28 of the 39 midshipmen identified by NCIS investigators in their report.

## The Honor Concept

28.   The Honor Concept of the Brigade of Midshipmen (USNAINST 1610.3E) ["the Honor Concept"] is a regulation promulgated by the Superintendent of the United States Naval Academy, governing the ethical standards of midshipmen.  It was developed in its present form in 1951.

29.   In accordance with § 0402 of the Honor Concept of the Brigade of Midshipmen, Midshipmen Culver reviewed the 28 cases forwarded to the Honor Committee by LT Cann and determined that 4 of the cases should be dismissed.

30.   The Honor Concept provides for the creation of a Brigade Honor Committee composed of seven midshipmen:  a chairman and six other officer midshipmen.  Honor Concept at § 0201.

31.   Upon learning of what may be a violation of the Honor Concept, a midshipman must either (1) discuss the incident with the suspected offender and then (a) report the offender; (b) caution the offender, or (c) drop the matter, if it appears that no violation was committed; or (2) immediately report the evidence to the Brigade Honor Committee.  Honor Concept at § 0109.

32.   Any report of a violation must be made within twenty-one (21) days of learning of the violation.  The Brigade Honor Chairman will terminate any case reported by an accuser more than 21 days after learning of the offense.  Honor Concept at § 0109.

33.   Only midshipmen, officers attached to the Naval
Academy, or Naval Academy civilian faculty may prefer formal
charges before the Honor Committee.  When an individual not
authorized to prefer formal charges reports facts suggesting a
violation of the Honor Concept, the Deputy Vice Chairman for
Investigation or the Ethics Advisor will prefer the formal
charges.  Honor Concept at § 0401.

34.   The Brigade Honor Chairman reviews each report of
a possible honor offense.  If the Chairman determines that there
clearly was no violation of the Honor Concept or that the case
was not reported within 21 days of the accuser learning of the
offense, he will terminate the case and make a report to the
Commandant of Midshipmen.  If the Chairman determines that an
honor offense may have been committed, he may, with the
Commandant's approval, caution the accused and terminate the
case.  All cases not terminated are forwarded to the Deputy Vice
Chairman for Investigations.  Honor Concept at § 0402.

35.   Once a midshipman is notified of the accusation
against him, he may select a Midshipman Advisor or waive the
right to an advisor.  Honor Concept at § 0404.

36.   Upon receiving a case from the Honor Chairman, the
Deputy Vice Chairman for Investigations will appoint a midshipman
investigating officer, who conducts a thorough investigation and
drafts a formal statement of charges.  If the investigating
officer believes that there clearly has been no honor violation,
he makes such a report to the Honor Chairman, who then decides

whether to continue the proceedings.  Honor Concept at § 0404, 0405.

37.  The Honor Concept provides that the Honor Board shall conduct a hearing which is an informal, non-adversarial proceeding to consider the facts of a case.  At the hearing, the midshipman investigating officer presents the results of his investigation to the Board.  Honor Concept at § 0408.

38.  If the case continues, the Honor Concept provides for the convening of a Brigade Honor Board consisting of midshipmen.  Honor Concept at § 0406.

39.  If a simple majority of the Honor Board, after considering all of the evidence, finds by a preponderance of the evidence that the accused midshipman violated the Honor Concept, the Honor Board reports that finding to the Commandant of Midshipman for further proceedings.  Honor Concept at § 0408.

40.  The accused midshipman has the right to have his identity kept confidential.  He has the right to a midshipman advisor or to legal counsel to prepare for a hearing, but not to have counsel at the hearing.  The midshipman also has the following rights:  the right to remain silent; the right to confront his accuser; to examine all physical or documentary evidence; call witnesses that are reasonably available and to cross examine witnesses called against him; and to make a written or oral statement.  Honor Concept at § 0302.

41.  The Commandant may return the case to the Honor Board for corrective action; return the case to a new Honor Board

of midshipmen for further investigation and a rehearing.  Honor
Concept at § 0409.

    42.  If the Commandant does not return the case to the
Honor Board, he is required to hold a hearing with the
midshipman, at which the midshipman may present evidence to
supplement the record.  The midshipman may also submit evidence
of mitigating or extenuating circumstances.  The Commandant must
render an independent judgment as to the credibility of
witnesses; he must independently find a violation of the Honor
Concept by a preponderance of the evidence; and, he must consider
matters in extenuation or mitigation.  Honor Concept at § 0409.

    43.  The Commandant may find no violation and terminate
the case; exercise discretion and recommend a disposition short
of separation; or, direct further investigation.  If the
Commandant finds a violation has occurred and he recommends
separation, the case is forwarded to the Superintendent of the
Naval Academy.  Honor Concept at § 0409.

    44.  Upon receipt of a case by the Superintendent, the
Superintendent has the duty to conduct a de novo review of the
type conducted by the Commandant including consideration of
mitigating and extenuating circumstances, although he need not
hold a hearing with the accused.  Honor Concept at § 0410.

    45.  Following his review, the Superintendent may:
terminate the case; direct further investigation; refer the case
back to the Commandant for imposition of a disposition short of

separation; or, recommend to the Secretary of the Navy that the midshipman be separated.  Honor Concept at § 0411.

47.     46.  The Honor Concept specifically allows both the Superintendent and the Commandant to exercise discretion in reviewing honor cases.  Discretion may be exercised in cases where either official believes that the midshipman has demonstrated the potential to develop the proper sense of honor to continue at the Naval Academy in spite of a finding of guilt.

    47.  Midshipman Honor Boards were held between March 3, 1993 and March 26, 1993 for the twenty-four midshipmen referred to Honor Boards.

### EE 311 Honor Board Results

    48.  Of the twenty-four cases submitted to Midshipmen Honor Boards in connection with the alleged EE 311 exam compromise, Honor Boards found violations of the Honor Concept in eleven cases.

    49.  The eleven cases in which findings of a violation were entered by the Honor Boards were then forwarded to the Commandant of Midshipmen for review pursuant to the Honor Concept.  Of these eleven, the Commandant dismissed four cases and forwarded the remaining seven cases to Rear Admiral Lynch, each with a recommendation for separation.

    50.  Rear Admiral Lynch reviewed the remaining seven cases, dismissed one case and referred the remaining six cases to

the Secretary of the Navy with the recommendation that the six midshipmen be separated from the Naval Academy.

### Navy Inspector General Investigation

51.  Complaints received by the Office of the Secretary of the Navy from Members of Congress questioning the dispositions in the 24 Honor Board cases and new allegations of more wide-spread cheating on the EE 311 examination led the then-Acting Secretary of the Navy, Admiral Kelso, on June 4, 1993 to instruct the Navy Inspector General to conduct another investigation into the compromise of the EE 311 examination.

52.  The Navy Inspector General initially detailed four investigators to conduct the investigation: two attorneys, a Navy Inspector General investigator, and one of the criminal investigators who participated in the initial NCIS investigation. The team was soon expanded to nine members with two additional NCIS investigators, one Marine Corps officer, and two activated naval reserve officers from the Navy Inspector General reserve unit.

53.  The Acting Secretary of the Navy, defendant Admiral Kelso determined that no Article 31 warnings would be given to midshipmen suspected of offenses during the pendency of this renewed investigation.

54.  Navy Inspector General investigators were advised by the Navy Inspector General that the purpose of their investigation was not criminal, but the investigators understood

there was the possibility that egregious conduct uncovered during the course of their investigation might be referred to courts-martial.

55. During the course of their investigation between June 4, 1993 and January 20, 1994, Navy Inspector General investigators conducted over 800 interrogations and interviews. Plaintiffs were interrogated by members of the Navy Inspector General team.

56. Each plaintiff was ordered by military officers and/or civilian Naval Inspector General investigators subject to the UCMJ to remain and cooperate with the investigators.

57. No plaintiff was warned of his or her rights in accordance with Article 31 or the Fifth Amendment prior to questioning.

58. No plaintiff was advised of his or her right to advice and presence of counsel during the interrogations.

59. Plaintiffs who invoked their Article 31 right to remain silent were told by civilian Navy Inspector General investigators and/or military officers that they had no Article 31 rights because the investigation was "administrative" in nature.

60. Plaintiffs who requested an attorney were advised by Navy Inspector General investigators and military officers that they had no right to counsel, as guaranteed by the Fifth Amendment to the United States Constitution, during their questioning.

— 14 —

61.   Plaintiffs with retained civilian counsel were questioned in the absence of their retained counsel despite plaintiffs' repeated requests for counsel.

62.   Plaintiffs were threatened by Navy Inspector General investigators with "general courts-martial," time spent in "Fort Leavenworth" and dismissal from the Naval Academy for demanding their Article 31 right to remain silent and for assistance of counsel.

63.   Plaintiffs were told by Navy Inspector General investigators that invocation of their Article 31 and counsel rights would cause investigators to label them as "uncooperative" in their report to Academy officials.

64.   Midshipmen were ordered by Navy Inspector General agents and military officers to answer the investigators' questions.

65.   In compliance with the orders of their superior military officers, each named plaintiff was compelled to make inculpatory statements to Navy Inspector General investigators.

66.   Case files on each plaintiff, prepared by Navy Inspector General investigators and forwarded to defendant Rear Admiral Lynch, included a statement about each plaintiff's degree of "cooperation" with investigators.

### The "Edney Board"

67.   Subsequent to the completion of the Navy Inspector General investigation, on January 13, 1994, defendant Rear

Admiral Lynch convened a board of three retired Navy Flag officers, each a graduate of the Naval Academy, to review the case files compiled by the Navy Inspector General.

68.  The three members of the board convened by Rear Admiral Lynch (the "Edney Board") included Admiral Leon A. Edney USN (Retired); Vice Admiral Charles S. Minter USN (Retired); and, Vice Admiral William P. Lawrence USN (Retired).

69.  No regulation promulgated by the Navy or the Naval Academy provides for the review of midshipman honor cases in any manner other than as provided in the Midshipman Honor Concept, nor was any authority cited by Admiral Lynch in convening the Edney Board.

70.  The Edney Board process for review of midshipmen honor cases relative to the EE 311 examination is unprecedented in the history of the Naval Academy.

71.  The Edney Board was provided assistance by a Navy Judge Advocate General Corps officer (lawyer).

72.  The members of the Edney Board were assigned to review each of the case files submitted by the Naval Inspector General along with the Naval Inspector General Report of Investigation to determine whether the allegations would provide "reasonable grounds that an honor violation was committed by the individual."

73.  The Edney Board considered the 133 Naval Inspector General case files, including plaintiffs' files, and the Naval Inspector General Report of Investigation ex parte without notice

to the plaintiffs or opportunity for plaintiffs to submit evidence for consideration.

74.    In reaching its findings as to whether there were reasonable grounds to believe an honor offense was committed, the Edney Board was not limited to consideration of the evidence in the case file alone.  The members also considered:

a.    fairness to the midshipman whose case file was reviewed;

b.    consistency in the outcome between cases; and

c.    consistency with the Naval Academy Honor Concept.

75.    The Edney Board was directed to forward the case files to the Brigade Honor Chairman for termination by him, if it was determined that the case file did not warrant an allegation of a potential honor offense.

76.    If the Edney Board concluded that a case involved conduct that would constitute a criminal violation under the Uniform Code of Military Justice, of a character not ordinarily processed under the Honor Concept, the Edney Board was to report that finding to defendant Rear Admiral Lynch without further elaboration.

77.    Where the Edney Board concluded that the evidence in the case file supported an allegation of a potential honor offense which should be punished by any of the sanctions, provided for in the Honor Concept, the Edney Board was required to make a recommendation as to the appropriate sanction and

forward the case file, with the recommendation, to the Brigade Honor Chairman.

78.    Each of plaintiffs' files were considered by the Edney Board and then forwarded to the Brigade Honor Chairman for further processing for alleged honor violations.

79.    The precept governing the Edney Board provided that midshipmen whose case files were considered by the Edney Board and found to support an allegation of an honor violation would have the right to contest the finding in an Honor Board of midshipmen pursuant to the Honor Concept or plead guilty before the Commandant of Midshipmen.

80.    In the cases of those midshipmen who chose to plead guilty before the Commandant of Midshipmen, the Commandant of Midshipmen was authorized to impose any sanction provided in the Midshipman Honor Concept regulation except separation from the Naval Academy.

### The "Allen Board"

81.    On January 24, 1994, in response to mounting political pressure, defendant Admiral Frank Kelso USN, appointed defendant Rear Admiral Richard C. Allen USN to preside over yet another honor review board to consider cases arising out of the compromise of the Fall 1992 Electrical Engineering 311 examination (the "Allen Board").

82.   The appointment of the Allen Board resulted in the suspension of dispositions of honor cases under the Edney Board procedures.

83.   The Allen Board appointed by Admiral Kelso was convened in lieu of and superseded the Midshipman Honor Board procedures and the rights and responsibilities contained in the Honor Concept solely for cases arising out of the EE 311 examination.

84.   The Allen Board has been instructed to only consider honor cases arising out of the EE 311 examination.

85.   The Allen Board is charged with reviewing each case referred to it "to determine whether the principles of the [Naval Academy] Honor Concept . . . were violated by the midshipman concerned as alleged in the honor charges before the Board."

86.   On information and belief, the Allen Board members have been or will be provided copies of the midshipmen case files prepared by Navy Inspector General investigators prior to the actual date of the hearing for their ex parte consideration.

87.   The Allen Board procedures provide that the midshipmen will be given notice of witnesses that the Board intends to call and have the right to confront and cross-examine the witnesses.  The midshipmen will also be provided with notice of the charges against them and with copies of physical or documentary evidence the Allen Board intends to consider, at

least three days prior to the midshipman's appearance before the Allen Board.

88.  On information and belief, the Allen Board will not make any recommendations until all cases have been heard. Evidence adduced in subsequent hearings, where the accused midshipman is not present to confront and cross-examine witnesses may be used by the Allen Board.

89.  The Allen Board will have military counsel assigned to assist the Board in its presentation and receipt of evidence.  Such counsel will be present at the hearings.

90.  Midshipmen appearing before the Allen Board are not permitted to have assistance of counsel in the hearing room. Retained counsel are required to remain outside the hearing room and may not assist in the presentation of the midshipman's case. In the event that a midshipman desires to consult with counsel during the pendency of the Allen Board hearing, the midshipman must request a recess from the President of the Board who, in his sole discretion may grant such a request, if in his view "good cause" is shown.

91.  Midshipmen appearing before the Allen Board may have the assistance of a fellow midshipman before the Board. However, the midshipman appearing before the Board must present his own case without assistance.

92.  Plaintiffs have requested and been denied the right to have the assistance of counsel in defending themselves before the Allen Board.

93.  Findings of the Allen Board require a majority vote and are governed by a preponderance of the evidence standard.

94.  In the event that the Allen Board concludes that an accused midshipman did not violate the Honor Concept, the charges will be dismissed, the case closed and no further action will be taken in the case.

95.  In the event that the Allen Board concludes that the midshipman appearing before it committed a violation of the Honor Concept, the Board is empowered to make either of two dispositions:

a.  Forward the case to the Naval Academy for imposition of an appropriate administrative sanction short of separation; or

b.  Recommend separation from the Naval Academy and forward the case to the Secretary of the Navy, via the Chief of Naval Operations, for further action.

96.  Each plaintiff was notified on February 7, 1994 that their files were to be considered by the Allen Board beginning on February 11, 1994.

97.  On information and belief, the Allen Board has scheduled seven cases per day for hearing, allotting one and one-half hours per hearing.  The hearings will continue six days per week (Sundays excluded) until all cases have been considered.

98.  On information and belief, the Secretary of the Navy, Navy Inspector General and other unidentified members of

the Office of the Secretary of the Navy have conducted extensive meetings on the allegations of cheating on the EE 311 examination and have decided, in advance of receipt of the recommendations of the Allen Board, the outcomes of the majority of cases to be considered by the Allen Board.

## COUNT I

### Admiral Kelso Lacks the Authority to Create the Allen Board

99.  Plaintiffs incorporate by reference the allegations set forth in paragraph 1 -- 98 above.

100. Admiral Kelso acted ultra vires in creating the Allen Board because it violates 10 U.S.C. § 6961, which reserves to the Superintendent of the United States Naval Academy the exclusive authority to recommend to the Secretary of the Navy the separation of midshipmen for the best interests of the service.

## COUNT II

### Denial of Right Against Compulsory Self-Incrimination

101. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 100 above.

102. The questioning of the plaintiffs constituted custodial interrogation for purposes of the Fifth Amendment to the United States Constitution.

103. The Navy Inspector General investigators denied all plaintiffs their statutory right to be warned in accordance with Article 31.

104. The Navy Inspector General investigators denied plaintiffs their Fifth Amendment right against compelled self-incrimination.

105. The Navy Inspector General investigators refusal to permit plaintiffs to consult with counsel and to have counsel present during custodial interrogation denied plaintiffs their Fifth Amendment and statutory due process rights.

106. The conscious denial of plaintiffs' constitutional and statutory rights was expressly condoned and approved by defendants John Dalton, Admiral Frank Kelso and Rear Admiral Lynch.

107. Admission of unwarned and involuntary statements against plaintiffs under circumstances where plaintiffs' rights were consciously and knowingly disregarded by their military superiors as a matter of policy would further violate plaintiffs' constitutional and statutory rights.


## COUNT III

### The Edney Board and Allen Board
### Procedures Deny Plaintiffs Due Process

108. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 107.

109. Defendants' creation of ad hoc hearing boards and procedures to substitute for Midshipman Honor Board procedures

provided in the Midshipman Honor Concept, solely to consider honor cases arising in connection with the EE 311 examination, violates plaintiffs right to administrative due process.

110. The Allen Board violates plaintiffs' rights to administrative due process by removing the Commandant of Midshipmen and the Superintendent of the United States Naval Academy from review of midshipman honor proceedings at the United States Naval Academy as provided by the Midshipman Honor Concept.

111. Due to the complexity and formality of the Allen Board hearings, the denial of assistance of counsel in the Board denies plaintiffs their right to due process under the Fifth Amendment to the United States Constitution.


## COUNT IV

**The Ex Parte, Pre-Allen Board Consideration
of the Navy Inspector General Case Files by the Office of the
Secretary of the Navy Violates Plaintiffs' Rights to Due Process**

112. Plaintiffs incorporate by reference the allegations set forth in paragraph 1 -- 111 above.

113. The pre-hearing evaluation and pre-judgment of the of case files by the Secretary of the Navy and his staff without notice to plaintiffs and opportunity for the midshipmen to be heard violates plaintiffs' rights to due process under the Fifth Amendment to the United States Constitution and the statutory process for recommending the separation of midshipmen provided in 10 U.S.C. §§ 6961 & 6962.

WHEREFORE, plaintiffs pray that the Court enter judgment in favor of plaintiffs and against defendants as follows:

1.    Issue an Order declaring that the conduct of Navy Inspector General Investigators violated plaintiffs' Article 31 and Fifth Amendment rights.

2.    Issue an Order declaring that defendant Admiral Kelso's appointment of the Allen Board is void because it impermissibly circumvents the discretion and authority vested in the Superintendent of the Naval Academy as provided in 10 U.S.C. §§ 6961 & 6962.

3.    Issue a preliminary injunction and a permanent injunction enjoining defendants and any lesser Department of the Navy official from considering any involuntary statements obtained by Naval Inspector General investigators, from any of the plaintiffs for any purpose, where such statements were not preceded by Article 31 warnings and advice concerning plaintiffs' rights to counsel.

4.    Issue a preliminary injunction and permanent injunction enjoining defendants from proceeding with the Allen Boards.

5.    Allow plaintiffs' their costs and reasonable attorney's fees.

6.    Grant to plaintiff all other relief that this Court deems proper and just.

Respectfully submitted,
**WILLIAMS & CONNOLLY**

By _____
    Steven M. Umin
      (D.C. Bar No. 47985)
    Charles W. Gittins
      (D.C. Bar No. 439710)
    Eric J. Moss
      (D.C. Bar No. 436127)
    Lori Jonas
      (D.C. Bar No. 436916)

    725 Twelfth Street, N.W.
    Washington, D.C.  20005
    (202) 434-5000

Counsel for Plaintiffs

DATED:  February 10, 1994