IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

FEB 18 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

```
MIDSHIPMAN LANCE BARNES, et al.    )
                                   )
              Plaintiffs,          )
     v.                            )     C.A. No. 94 0261 (HHG)
                                   )
HONORABLE JOHN DALTON,             )
SECRETARY OF THE NAVY, et al.      )
                                   )
              Defendants.          )
                                   )
```

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Any question as to whether the Allen Boards created by the Chief of Naval Operations constitute an overreaction to pressures from Congress and the media has now been answered. Once again, scrambling to satisfy its critics on Capitol Hill, the Navy has disregarded the Constitution as an expedient to "get results." Defendants now, in afterthought, offer eleventh-hour declarations from senior Navy leadership and a series of technical defenses in an effort to excuse the egregious violations of plaintiffs constitutional rights. Ironically, defendants' custom-tailored declarations and the ever-changing Allen Board procedures only serve to substantiate plaintiffs' claims.

In this Reply, plaintiffs' confront and refute each of defendants alleged defenses, one by one.

I.   **VENUE IS PROPER**

The law is clear that the District of Columbia is an appropriate venue for an action against military or civilian

defendants based in the Pentagon.  See Cohen v. United States Department of the Air Force, 707 F. Supp. 12, 13 (D.D.C. 1989); Mundy v. Weinberger, 554 F. Supp. 811, 817 (D.D.C. 1982). Defendants assert a half-hearted argument, by way of footnote, that venue is not proper in the District of Columbia for this action against, among others, the Secretary of the Navy and Chief of Naval Operations.  In support, plaintiffs offer the Court two cases, neither of which is on point.  Donnell v. National Guard Bureau, 568 F. Supp. 93 (D.D.C. 1983) involved Title VII which has a specialized venue provision.  Similarly, Lamont v. Haig, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978), does not address the proper venue for Pentagon defendants.

## II.  THIS CONTROVERSY IS RIPE FOR REVIEW

        Defendants' primary response to plaintiffs' showing that they are likely to prevail on the merits is that plaintiffs' claims are not ripe for judicial review.  Defendants argue that because it is unclear whether the Allen Board will find any of the plaintiffs guilty, this Court should not act until after the hearing process has been completed.  Plaintiffs, however, have not asked this Court to consider the merits of the allegations arising from the compromise of the EE 311 examination.  Rather, plaintiffs have only asked it to consider the legality of the Navy's procedures specially crafted to adjudicate honor cases arising from the compromise of the EE 311 examination.  Waiting for the outcome of the hearings will change nothing this Court must consider in resolving these legal issues.  Yet, waiting will

force plaintiffs to attend arguably illegal hearings and suffer significant hardship in the process.[1]

The "basic rationale" for the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967). To achieve this goal of judicial economy, the ripeness of "pre-enforcement" agency actions should be considered in light of "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Eagle-Picher Industries v. United States E.P.A., 759 F.2d 905, 917 (D.C. Cir. 1985) (quoting Abbott Laboratories, 387 U.S. at 149). Under both prongs, the instant action qualifies as ripe.

The "fitness" prong inquires into the suitability of the action for decision by judges. See Midwestern Gas Transmission Co. v. FERC, 589 F.2d 603, 618 (D.C. Cir. 1978); Continental Air Lines, 522 F.2d at 125. So long as the issues raised are purely legal ones, see Eagle-Picher, 759 F.2d at 915, there can be no doubt that this element of the ripeness doctrine has been satisfied. See id. Here, plaintiffs are only asking this Court to consider the legality of the Allen Boards and the

---

[1]  Courts do not shrink from reviewing regulations and procedures before agencies have actually implemented the policies. See Flemming v. Florida Exchange, 358 U.S. 153, 167-68 (1958) (court granted immediate review of regulation that was not to become effective until three years after its enactment); Continental Air Lines v. C.A.B., 522 F.2d 107, 124-25 (D.C. Cir. 1974) ("The action may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect.").

conduct of Navy IG investigators -- issues that have "crystallized" and are in "final form" -- a situation eminently suitable for judicial consideration.

Moreover, this Court is particularly competent to evaluate plaintiffs' legal claims. For the most part, plaintiffs raise issues of Fifth Amendment law and statutory interpretation -- the type claims this Court considers every day. The issues are not unique to military law. And, indeed, the Allen Board, comprised of five line officers, is conspicuously unqualified to address such questions. As an indication of how sadly unfit the Allen Board is to address legal issues, the Allen Board on February 18, 1994 rejected objections filed by counsel on the ground that the midshipmen had not personally filed them. See Exhibit 1.

Turning to the second element pertinent to the ripeness analysis, plaintiffs will suffer significant personal hardship if forced to attend the Allen Boards. Defendants' brief seems to suggest that an actual injury must occur before there is sufficient hardship to plaintiffs to warrant judicial review. But the hardship element of the ripeness test does not require that a party already have been injured. Instead, it is enough to constitute hardship if there exists "a realistic danger of sustaining a direct injury." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298; see FCC v. WNCN Listeners Guild, 450 U.S. 582, 584-85 (1981) (reviewing Federal Communications Commission policy statements prior to enforcement); Eagle-Picher

Indus. v. EPA, 759 F.2d 905, 917 (D.C. Cir. 1985) (footnote omitted) ("[I]t is clear beyond peradventure that the validity of a rule can be ripe for review whether or not it has actually been improperly applied and enforced in a concrete factual setting.").

As defendants' Opposition correctly notes, the midshipmen are close to graduation. The projected hearings will predictably continue to preoccupy them and impair the completion of their course work at the Academy. Moreover, it is not enough that this Court could later undo the adjudications that a given student lied or cheated. A subsequent ruling by this Court, even though it enjoined Navy disciplinary action, could never restore plaintiffs' reputations.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES IS NOT REQUIRED IN THIS CASE

Plaintiffs' suit is not jurisdictionally barred by the failure to exhaust administrative remedies. The case law is clear that where the plaintiffs challenge the constitutional adequacy of adjudicative procedures or the statutory authority of an agency to take the action in question, exhaustion is not required because it would not further the purposes of the doctrine. See, e.g., Matthews v. Eldridge, 424 U.S. 319, 330-32 (1976); Andrade v. Lauer, 729 F.2d 1475, 1491 (D.C. Cir. 1984); Finnerty v. Cowen, 508 F.2d 979, 983 (2d Cir. 1974); Volkswagen De Puerto Rico, Inc. v. Puerto Rico Labor Relations Bd., 454 F.2d 38, 41 (1st Cir. 1972). Accordingly, since this case raises issues of precisely that nature -- the authority of the Chief of

Naval Operations to convene the Allen Board and the constitutional adequacy of the Allen Board procedures -- exhaustion is not required.[2]

The courts have identified four purposes served by the exhaustion doctrine: "(1) to prevent interference by the courts in matters which in the first instance require the exercise of either agency discretion or expertise; (2) to maintain the autonomy and assure the proper functioning of the administrative system Congress has structured; (3) to avoid unnecessary interference with ongoing administrative processes; and (4) to assure judicial efficiency, i.e., successful vindication of rights in administrative process may negate need for judicial review." Committee for GI Rights v. Callaway, 518 F.2d 466, 474 (D.C. Cir. 1975) (citing McKart v. United States, 395 U.S. 185, 193-95 (1969)). None of these interests would be furthered by requiring exhaustion in the present case.

Because the issues raised in plaintiffs' complaint are purely legal, no application of agency expertise or factual development will aid the court's decision as to whether the adoption of the Allen Board was beyond the Chief of Naval Operations' authority. In that respect, the present case is similar to Athlone Indus. v. Consumer Prod. Safety Comm'n., 707

---

[2]  Exhaustion "is not in general jurisdictional." Andrade, 729 F.2d at 1484. The law of this circuit does not require exhaustion of administrative remedies when "the reasons supporting the doctrine are found inapplicable." Andrade, 729 F.2d at 1484. In such cases, "the doctrine should not be blindly applied." Id.

F.2d 1485 (D.C. Cir. 1983), in which the plaintiffs challenged

the statutory authority of the CPSC to assess civil penalties in

an administrative proceeding:

> the scope of the Commission's statutory authority
> is strictly a legal issue.  No factual development
> or application of agency expertise will aid the
> court's decision.  Nor will a decision by the
> court invade the field of agency expertise or
> discretion.  "[W]here the only dispute relates to
> the meaning of the statutory term . . .  [the
> controversy] presents issues on which courts, and
> not [administrators] are relatively more expert."

Id. at 1489 (quoting Barlow v. Collins, 397 U.S. 159, 166

(1970)).  The court held that exhaustion of administrative

remedies was not required.  Id.

Similarly, the issue of whether the Board's procedures

are constitutionally infirm does not require factual development

or Navy expertise.  Directly on point is the Court of Appeals'

decision in Committee for GI Rights v. Callaway, 518 F.2d 466,

474 (D.C. Cir 1975), in which a large class of GIs challenged the

constitutionality of an Army regulation that authorized

warrantless inspections for drugs.  The Army argued that the case

should be dismissed because the class members had failed to

exhaust their military remedies, including raising the

constitutional issue as a defense in a court-martial.  Id. at

473.  The court specifically rejected this argument:

> In this case no significant interest is served by
> forcing the plaintiffs-appellees to proceed
> through military channels.  The issues involved
> are purely legal, requiring no exercise of
> military discretion or expertise.  The federal
> courts are in a better position to consider the
> constitutional issues presented than are the
> various military bodies referred to by the

> appellants.  Moreover, the military tribunals are
> not designed to handle actions involving so large
> a class and seeking declaratory and injunctive
> relief.  . . .  To require exhaustion of military
> remedies would merely delay a decision by the
> federal courts.

Id. at 474.  Similarly, in the present case plaintiffs seek

declaratory and injunctive relief on the constitutionality of the

proceedings and the authority of the Chief of Naval Operations.

These are matters eminently suited for judicial determination;

exhaustion of military remedies serves no purpose.

Moreover, this court does not require exhaustion when

such an exercise would be futile, Randolph-Sheppard Vendors of

America v. Weinberger, 795 F.2d 90, 105 (D.C. Cir. 1986), as it

would be when an agency has already articulated a clear position

and a demonstrated unwillingness to reconsider it.  Id. (citing

Etelson v. Office of Personnel Mgmt., 684 F.2d 918, 925 (D.C.

Cir. 1982)).  Such is the case here.  In creating and defending

the Allen Board, the Navy has articulated very clear positions on

the inapplicability of Article 31 and the Fifth Amendment to the

Inspector General's ("IG") investigations, see IG Report at ¶ 45,

and the right to counsel in the Allen Board hearings, see Allen

Board Precepts, Enclosure 2 at ¶ 1(d).[3/]  There is no point in

requiring midshipmen to present those constitutional and

statutory arguments again.  Indeed, the Allen Board, created by

_____

[3/]   The Declaration of Admiral Kelso dated February 16, 1994
       purports to alter this regulation by allowing counsel to be
       in the hearing room though not to participate.  No written
       amendment to this effect has been issued to any Navy defense
       counsel.

order of the Chief of Naval Operations and governed by his
written precepts, has no power to change its rules or dissolve
itself even if it were, to the surprise of everyone, to agree
with these arguments.

       The cases cited by the government that purport to
require exhaustion are inapposite.  First, each, the court
ordered exhaustion only where an agency had <u>established</u>
procedures in place to deal specifically with the question raised
by the plaintiff.  Second, in none of these cases did the
plaintiffs challenge the adequacy of the procedures or the
authority of the agency to take a specified action.  Lastly, and
of crucial importance, in all cases cited by the government the
agency provided at least one level of appeal.  See <u>Sampson v.
Murray</u>, 415 U.S. 61 (1974) (Civil Service Commission);  <u>Wallace
v. Lynn</u>, 507 F.2d 1186, 1188 (D.C. Cir. 1974) (HUD employees had
available HUD grievance procedures as well as appeals to the HUD
Personnel Office and the Civil Service Commission); <u>Andrade</u>, 729
F.2d at 1484-85 (dismissing only those claims that do not
question constitutional authority and that can be addressed
through various review procedures); <u>Randolph-Sheppard Vendors</u>,
795 F.2d at 93 (two-tiered administrative dispute resolution
system).  The lack of appellate review here makes the exhaustion
requirement a pointless burden, for unless every single plaintiff
is acquitted at the Allen Boards, resolution of these issues in
this Court is inevitable.

## IV.  THE HONOR REVIEW PROCESS VIOLATES 10 U.S.C. § 6962

In response to the clear command of 10 U.S.C. § 6962, defendants take the position that the Chief of Naval Operations ("CNO") is free to disregard the provisions of law when he determines it expedient to do so.  In support of this remarkable argument, defendants offer, without citation to law or regulation, the truism that a "superior officer always retains the authority to act in lieu of a subordinate."  Opp. at 28. But the supposed analogy of a superior commander's authority to withhold authority from a subordinate to dispose of a courts-martial case is not an analogy at all.  Indeed, it simply proves plaintiffs' point because the Rules for Courts-Martial, 401 and 601, cited by defendants as the basis for the analogy, find their source of authority in the express provisions of a statute.  See, e.g., Article 22(b) UCMJ, 10 U.S.C. 822(b) (superior command authority may convene general courts-martial in lieu of subordinate).  Note that 10 U.S.C. § 6962 makes no provision for "recusal" or transfer of duties to another person.  Plaintiffs clearly are entitled to enforcement of this statute.  Harmon v. Brucker, 355 U.S. 579, 582 (1957) (per curiam) (judicial relief from official action contrary to statute available to plaintiff).

Notwithstanding defendants' arguments to the contrary, neither the Chief of Naval Operations, the Superintendent of the Naval Academy, nor the Secretary of the Navy is free to disregard, modify or circumvent the law governing the separation

of midshipmen from the Naval Academy.[4]  See <u>Dougherty v. Hidalgo</u>, 539 F. Supp. 4, 6-7 (E.D. Pa. 1981).  The task of changing or modifying the law is within the sole province of the Congress.

## V.    PLAINTIFFS ARTICLE 31 AND FIFTH[5] <u>AMENDMENT RIGHTS WERE CLEARLY VIOLATED</u>

Defendants urge this Court to find no violation of plaintiffs' Article 31 or Fifth Amendment rights against self-incrimination.  They do so based on this week's (February 16, 1994) declarations by Admiral Kelso and Admiral Bennett that, in most cases, courts-martials would not be convened.  But these declarations fail as a matter of law to justify the absence of Article 31 and Fifth Amendment warnings.[6]

---

[4]    Indeed, defendants' argument raises an interesting irony -- the Superintendent of the Naval Academy feels ill-equipped to handle the only responsibility laid on his shoulders by any statutory provision.

[5]    Plaintiffs are perplexed by defendants' repeated reference in their Opposition to the Sixth Amendment right to counsel. Plaintiffs have not raised a Sixth Amendment claim in any pleading filed in this case.

[6]    Footnote 6 of Defendants Memorandum, implying that warnings would have been given in non-cheating or non-lying circumstances, is utterly misleading.  Admiral Kelso did not "authorize" the reading of Article 31 rights in cases where midshipmen were suspected of more than lying or cheating, he <u>ordered</u> that these warnings be given.  Kelso Dec. ¶ 20. The Navy Inspector General violated <u>both</u> Admiral Kelso's order <u>and</u> Article 31 in at least two instances.  It was well known to the Navy IG, because of evidence developed by NCIS, that two midshipmen, Escobar and Rounds, were suspected of having been involved in the theft of the examination.  Despite the fact that the two were clearly "suspected" of more than lying or cheating, they were not given Article 31 warnings.

- 11 -

A. <u>Fifth Amendment</u>

As defendants ironically point out in their Opposition,

> the privilege against self-incrimination
> "not only permits a person to refuse to testify
> against himself at a criminal trial in which he
> is a defendant, <u>but also 'privileges him not to</u>
> <u>answer official questions put to him in any other</u>
> <u>proceeding, civil or criminal, formal or informal</u>,
> where the answers might incriminate him in future
> criminal proceedings.'"

Defendants' Opp. at 31 (quoting <u>Minnesota v. Murphy</u>, 465 U.S.

420, 426 (1984))(emphasis added).  The after-the-fact

declarations of Admiral Kelso and Admiral Bennett, that they did

not then, and do not now, contemplate courts-martial proceedings,

can have no retroactive effect upon the plaintiffs' reasonable

beliefs concerning courts-martial at the time they were

interrogated by the Navy IG investigators.  The reasonable belief

upon which the right to self-incrimination is predicated is the

belief the person questioned holds at the time of the

interrogation, not at some later time.  <u>In re Gault</u>, 387 U.S. 1,

47-48 (1967); <u>United States v. Byers</u>, 239 U.S. App. D.C. 1, 740

F.2d 1104, 1112 (D.C. Cir. 1984); <u>In re Grand Jury Proceedings</u>,

160 U.S. App. D.C. 249, 491 F.2d 42, 44 (D.C. Cir. 1974).

Moreover, contrary to assertions in the Opposition,

Opp. at 30, no plaintiff has ever been told that he or she will

not face courts-martial for the EE 311 compromise.  And, because

plaintiffs were never told by their interrogators <u>during</u> <u>their</u>

<u>interrogations</u> that courts-martials had been ruled out for

cheating, plaintiffs' fear of potential incrimination was per se

- 12 -

reasonable.[7]    Finally, if, as Admiral Kelso and Admiral Bennett now declare, they contemplated providing immunity from prosecution to the plaintiffs,[8] there were (and are) established procedures for doing so set forth in the Manual for the Judge Advocate General of the Navy, JAGINST 5800.7C, ¶ 0138.[9]

By its own admission, the Navy has always left open the possibility of courts-martials.  Navy IG Report, ¶ 45.  Even now, while trumpeting alleged "de facto immunity" to excuse the earlier violation of plaintiffs' Article 31 and Fifth Amendment rights, the Navy has not ruled out court-martials: "The Navy has made it plain that, as the evidentiary record now stands, no criminal or courts-martial proceedings will be pursued against

---

[7]    Cheating on an examination is a criminal offense punishable by one year in prison and a dismissal from the naval service.  See Article 133 UCMJ; Manual for Courts-Martial, United States, 1984, ¶ 59c(3).

[8]    Such an assertion is, in any event, transparently false. The Navy specifically considered court-martial charges for theft of the examination.  IG Report, ¶ 27.

[9]    Moreover, even if the plaintiffs had been advised that courts-martial were not possible, they could not have been expected, without advice of counsel, to have understood the investigators' threats of courts-martial to relate solely to failure to provide information as ordered.  Indeed, in unvarying detail, investigators used threats of courts-martial and time in "Fort Leavenworth" to extract statements from plaintiffs.  See Plaintiffs' Affidavits, Exhibit A to Plaintiffs' Supplemental Memorandum in Support of Temporary Restraining Order.  Plaintiffs' belief that they faced potential courts-martial could hardly have been more reasonable given the unconscionable threats of the Navy Inspector General investigators.

any plaintiffs." Opp. at 31. This post hoc equivocal assertion that no plaintiff will face court-martial is factually and legally irrelevant to the plaintiffs Fifth Amendment rights during the conduct of the interrogations. Like all of the Allen Board procedures, these tardy assertions are jerry-built to serve newly arisen needs.

## B. Article 31

Defendants also rely, erroneously, on the characterization of the investigation as "administrative" to excuse the failure of investigators to warn plaintiffs of their Article 31 right to remain silent. Defendants can offer no citation of authority for the proposition that Article 31 rights warnings are not required in an "administrative investigation" because the Navy's own regulation unequivocally demands the opposite. The Navy has published a detailed directive concerning the conduct of "administrative" investigations. The chapter concerning "Administrative Investigations and Fact-Finding Bodies" within the Manual of the Judge Advocate General of the Navy, JAGINST 5800.7C, provides in pertinent part:

> Witnesses suspected of an offense, misconduct or improper performance of duty. Ordinarily, a fact-finding body should collect relevant information from all other sources before interviewing persons suspected of an offense, misconduct, or improper performance of duty. Before the interview, the member **must** be advised of Article 31, UCMJ, warnings.

JAGINST 5800.7C, ¶ 0213c(2) (emphasis supplied)(attached as Exhibit 2). On its face, questioning midshipmen suspected of the

offense of cheating on an examination in the absence of Article 31 warnings was a clear violation of the Navy's own regulation governing administrative investigations.

Defendants cite United States v. Anderson, 21 M.J. 751, 757 (N.M.C.M.R. 1985) for the proposition that Article 31 rights warnings are not required unless the accused is questioned "with an investigatory intent or to elicit incriminating responses in anticipation of criminal prosecution." Opp. at 32. But the Anderson Court simply held in that case that non-custodial questioning for the purpose of locating a shooting victim to provide immediate medical assistance did not implicate "the unique problems created by interrogations within the military rank structure which were addressed by Congress in enacting Article 31." 21 M.J. at 758. Quite obviously, the fact situation in Anderson is light-years removed, and therefore irrelevant, to the custodial interrogations involved in this case.

The overbearing and threatening conduct of the IG investigators is precisely the circumstance feared by Congress when it enacted Article 31. In this IG investigation, the investigators did not obtain incriminating responses from plaintiffs by use of "subtle pressure" as concerned the Court in United States v. Duga, 10 M.J. 206, 210 (C.M.A. 1981). Worse, they used the blunderbuss of military rank to extract the statements forcibly. See United States v. King, 16 C.M.R. 858, 865 (1954) (inducements, promises, threats or physical or mental

- 15 -

abuse deprive an accused of freedom of will and violate the privilege against self-incrimination).

The appropriate sanction in this case is suppression of the statements coerced from plaintiffs. <u>Giles v. Secretary of the Army</u>, 475 F. Supp. 595 (D.D.C. 1979), <u>aff'd and remanded on other grounds</u>, 627 F.2d 554 (D.C. Cir. 1980). <u>Giles</u> holds that evidence obtained in violation of Article 31 may not be admitted in administrative proceedings for the separation of a service member. Defendants correctly note that the <u>Giles</u> decision relies on the Court of Military Appeals decision in <u>United States v. Ruiz</u>, 48 C.M.R. 797 (C.M.A. 1974) (Congress did not intend "to permit forced self-incrimination at the board proceedings any more than in courts-martial"). But contrary to defendants' assertion, the Court's ruling in <u>Ruiz</u>, that evidence obtained in violation of Article 31 could not be admitted in either administrative or courts-martial proceedings, has never been overruled or modified by any decision of that Court. Defendants completely misunderstand the limited effect of <u>United States v. Armstrong</u>, 9 M.J. 374 (C.M.A. 1980) on the <u>Ruiz</u> decision. In <u>Armstrong</u>, the Court of Military Appeals simply ruled that urinalyses are "not subject to self-incrimination safeguards as [they] lack[] the qualities of a communication by the suspect." <u>Armstrong</u>, 9 M.J. at 379.

Exclusion of the evidence would place plaintiffs in the same position they would have been in had the Superintendent not canceled the Honor Concept procedures for this class of cases.

The Honor Concept provides midshipmen the right to remain silent once accused of an honor offense. See §§ 0303; 0503. Under § 0503(d)(2) of the Honor Concept, witnesses also may rely on their Article 31 and Fifth Amendment rights to remain silent where their statements might implicate them in an honor violation for which separation is authorized. Finally, the Honor Concept provides that "[o]fficers conducting hearings shall not consider confessions or admissions obtained by unlawful coercion or inducement likely to effect its truthfulness." § 0503. Therefore, since plaintiffs would have been entitled under the Honor Concept to have such statements excluded from consideration, this Court should enforce that right now.

## VI.  THE NAVY'S FAILURE TO FOLLOW ITS OWN REGULATIONS VIOLATES DUE PROCESS

The defendants offer two arguments why the suspension of the Honor Concept and its replacement with the Allen Board procedure does not violate due process: (1) such a move was prudent in light of the circumstances; and (2) the CNO has not failed to abide by Honor Concept, he has simply superseded it, a power he is free to exercise at any time. Neither argument has merit.

The prudence of a regulation is, of course, no measure of its constitutionality. See Patlex Corp. v. Mossinghoff, 771 F.2d 480, 483 (Fed. Cir. 1985) ("administrative convenience or even necessity cannot override the constitutional requirements of due process"). Nor are difficult circumstances an excuse to

- 17 -

abridge civil rights.  See Hartness v. Bush, 919 F.2d 170, (D.C. Cir. 1990) (Edwards, J., dissenting) (rejecting the constitutionality of random drug testing and noting "The Fourth Amendment is not some discretionary doctrine, subject to waiver for good cause.  It is instead a constitutional command, and as such stands apart and above contemporary expediences. . . . Constitutional principles, once abandoned, are not easily reclaimed."), cert. denied, 111 S. Ct. 2890 (1991).

The assertion that the Allen Board does not amount to a violation of the Honor Concept that deprives plaintiffs of due process because it simply supersedes the Honor Concept, ignores the limits on an agency's rulemaking power.  "An agency's power to revoke its regulations is not unlimited." Nader v. Bork, 366 F. Supp. 104, 108 (D.D.C. 1973).  In Nader, the Attorney General abolished the Office of the Watergate Special Prosecutor on October 23, and reinstated it less than three weeks later under a virtually identical regulation.  Id. at 109.  The court found that "it is clear that this turnabout was simply a ruse to permit the discharge of Mr. Cox without otherwise affecting the Office of the Special Prosecutor -- a result which could not legally have been accomplished while the regulation was in effect." Id. The court held that such an act was arbitrary and unreasonable and "must be held to have been without force or effect." Id.

Similarly, in this case, the Superintendent has canceled the Honor Concept only to deal with one case, the compromise of the EE 311 examination.  See Allen Board Precept

Convening an Honor Review Board to Consider Cases Arising Out of
the Compromise of the Fall 1992 Electrical Engineering 311
Examination (only cases to be addressed under regulation are
EE311 cases) (enclosure (1) to Lynch Dec. filed with Defendants'
Opp.).  As the Nader case makes clear, such a revocation of an
existing regulation simply because its application to a certain
situation would not serve the agency's interest is a violation of
due process.  See also Montilla v. INS, 926 F.2d 162, 169 (2d
Cir. 1991) ("Careless observance by an agency of its own
administrative processes weakens its effectiveness in the eyes of
the public because it exposes the possibility of favoritism and
of inconsistent application of the law.").

　　　　Indeed, the meaning of the cases cited in plaintiffs'
opening brief articulating and applying the Accardi doctrine, see
Plaintiffs' Memorandum at 15-16, would be utterly eviscerated if
the Court were to adopt the rule defendants urge.  Those cases
uniformly stand for the proposition that agencies, including
branches of the armed forces, must not ignore their own
regulations.  The expedient of issuing ad hoc regulations is
identical in effect to simply ignoring the prior regulation.  If
an agency is not free to ignore existing regulations, it is not
free on the eve of a particularly difficult, unpleasant or
troublesome case to fashion a new rule.

　　　　Lastly, the due process concerns raised by the Navy's
revocation of its own regulation are compounded by the
"Regulation De Jour" atmosphere that the midshipmen and their

counsel have been forced to endure since January 24. In the rush to replace the extensive set of procedures and protections laid out in the Naval Academy Honor Concept, the Navy did not have time to iron out the wrinkles in the Allen Board Precepts. Hence, it was not until the defendants filed this lawsuit that the Navy decided to allow defense counsel in the hearing room during the Boards.[10/] Similarly, it was not until February 8, that defense counsel were advised that the hearings would not exceed 1.5 hours in length. Likewise, on February 10, defense counsel were advised that members of the Electrical Engineering Department would not be available to assist counsel or be called as defense witnesses. But on February 15, after military defense counsel provided affidavits to that effect to undersigned counsel, they were advised that the Electrical Engineering Department professors now _were_ willing to testify.[11/] Such

---

[10/]    Even now, defense counsel are relegated to the role of "potted plants," not permitted to participate or meaningfully assist their clients in their defense. See Kelso Dec. at ¶ 25; see also Denial of Defense Counsel's Objections. (Attached hereto as Exhibit 3).

[11/]    Another serious problem arising out of the artificially expedited nature of the Allen Board process is that midshipmen and their defense counsel have had insufficient time to decode the meaning of the Precepts. For example, the procedures purport to permit an accused midshipman to obtain and examine "all" documentary and physical evidence in the case. However, solely by happenstance, military counsel have found that exculpatory statements have been withheld from them. See Requests for Evidence (Statements) Declarations of Military Defense Counsel, attached hereto at Exhibit 4. Similarly, detailed defense counsel have been denied access to the NCIS report, despite repeated requests and its obvious relevance to the case.

hide-the-ball changes in board procedures raise bedrock due process concerns of fairness. See The Historic Green Springs, Inc. v. Bergland, 497 F. Supp. 839, 856 (E.D. Va. 1980) (both lack of fixed procedures published in advance and publication of procedures in piecemeal fashion violate due process), vacated on other grounds, 12 Envtl. L. Rep. 20100 (E.D. Va. 1981).

## VII. **PLAINTIFFS WILL SUFFER IRREPARABLE HARM**

Plaintiffs will incur two forms of irreparable harm if the injunction is denied -- an adverse finding by the Honor Review Board would interfere with plaintiffs' timely completion of studies at the Academy; and such a finding would stigmatize them with the irreversibility of a tattoo. In their Opposition, defendants half-heatedly attempt to distinguish the first ground and completely ignore the second.

First, defendants complain that plaintiffs' counsel only cited cases where the midshipman/cadet has already been expelled from the academy. See Tully v. Orr, 608 F. Supp. 1222 (E.D.N.Y. 1985); Dougherty v. Hidalgo, 539 F. Supp. 4 (E.D. Pa. 1981); Love v. Hidalgo, 508 F. Supp. 177 (D. Md. 1981). In other words, defendants are arguing that plaintiffs are not irreparably harmed until they are actually dismissed from the Academy. In making this argument, defendants ignore the fact that by waiting such a time period, plaintiffs are almost certainly assured that they will not graduate with their classmates, will not be commissioned with their peers, and will not receive assignments they have already chosen in accord with their class standing.

Second, defendants fail to respond to plaintiffs argument that an adverse finding by the Honor Review Board would irreparably harm plaintiffs' reputations in the Navy. See Tully, 608 F. Supp. at 1226 (noting that "[t]he loss of status involved, including the indelible stigma of having once been disenrolled, cannot but have a deleterious effect on plaintiff's future as a Air Force Officer."); see also Baker v. Sullivan, 1990 U.S. Dist. LEXIS 15492 (N.D.N.Y.) (granting preliminary injunction because court found that the Department of Health and Human Services exclusion of physician plaintiff from participating in the medicare program would irreparably damage his reputation in the community). Accordingly, defendants have failed to refute either of the two grounds set forth in their memorandum in support of the motion for preliminary injunction.

## VIII.   BALANCE OF THE HARDSHIPS

Defendants' argument that rapid disposition of the alleged honor violations is required because of possible effects on Navy assignments and Naval Academy morale similarly does not wash. First, if it was appropriate to take the time to assure that the Navy IG investigation was completed thoroughly (and after the December 5, 1993 Army-Navy game), see Navy IG Report, ¶ 114b, it can hardly be inappropriate to pause and assure that the resultant disposition process comports with the minimum requirements of due process. Second, each midshipman in the graduating class has been provided his post-graduation assignment. Finally, it could hardly be doubted that morale at

the Naval Academy will be damaged, perhaps permanently, if it appears that midshipmen around the corner from graduation have been railroaded out of the Academy.  The same factors cited by the Government as counseling rapid resolution suggest a rational basis for proceeding with the Allen Boards only with caution.[12]

\*     \*     \*

Based on the foregoing, plaintiffs respectfully urge this Court to deny defendants' motion to dismiss and to grant plaintiffs' motion for injunctive relief enjoining the Navy from holding the Allen Boards until after plaintiffs' claims have been heard on the merits.

Respectfully submitted,

**WILLIAMS & CONNOLLY**

By: _____

Steven M. Umin
  (D.C. Bar # 47985)
Charles W. Gittins
  (D.C. Bar # 439710)
Eric J. Moss
  (D.C. Bar # 436127)
Lori Jonas
  (D.C. Bar # 436916)

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

Counsel for Plaintiffs

DATED: February 19, 1994

---

[12]  One need only look to the ultimate result of the Tailhook investigation (i.e., no successful prosecutions) and the U.S.S. Iowa investigation (i.e., Navy investigative findings ultimately discredited) to see that Navy leadership has a history of counter-productive overreaction under pressure from Congress and the media.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIDSHIPMAN LANCE BARNES, _et al._          )
                                           )
                    Plaintiffs,            )          CA No. 94 0261 (HHG)
                                           )
          v.                               )
                                           )
HONORABLE JOHN DALTON                      )
SECRETARY OF THE NAVY, _et al._            )
                                           )
                    Defendants.            )
                                           )

**FILED**

**FEB 1 8 1994**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**EXHIBITS TO PLAINTIFFS' REPLY MEMORANDUM IN
SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Ex. 1

Ser J/57
18 FEB 94

From: Honor Review Board
To:   LT Sinclair, JAGC, USN

Subj: OBJECTION TO ADMISSION OF STATEMENTS

**FILED**

**FEB 1 8 1994**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Ref:  (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
      (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl: (1) Objection on behalf of Midshipman First Class Payne
      (2) Objection on behalf of Midshipman First Class Whitlatch
      (3) Objection on behalf of Midshipman First Class Hines
      (4) Objection on behalf of Midshipman First Class Claiborne
      (5) Objection on behalf of Midshipman First Class Buck

1.  The Honor Review Board has received enclosures (1) through (5).  Under the rules governing Board proceedings, references (a) and (b), a midshipman accused of an honor violation will have an opportunity to object to the admissibility of evidence.  There is, however, no provision for legal counsel, a midshipman advisor, or any other person to make objections or other representations for a midshipman.

2.  Enclosures (1) through (5) are, therefore, returned.

F.J. PROCHAZKA
CDR, JAGC, USN
LEGAL ADVISOR

CA 94-261

106

FEB 17 1994

17 Feb 94

From:    LT Nancy A. Sinclair, JAGC, USN, Defense Counsel
To:      Rear Admiral Richard C. Allen, USN

Subj:    OBJECTION TO CONSIDERATION BY THE HONOR BOARD OF STATEMENTS
         TAKEN IN VIOLATION OF ARTICLES 31 AND 98 OF THE UCMJ ICO
         MIDSHIPMAN FIRST CLASS ANDREW PAYNE

1.   I respectfully object to the consideration of all statements
taken by the Naval Inspector General agents on the grounds that the
IG, in contravention of clear statutory language, made a calculated
decision to violate Articles 31 and 98 of the Uniform Code of
Military Justice by willfully and intentionally failing to inform
midshipmen of the right to remain silent.   The investigators knew
and understood that each midshipman was suspected of violating the
Honor Concept, and hence, Article 133 of the Uniform Code of
Military Justice.   The IG report makes it clear that even before
the interrogations were conducted, the IG understood that
particularly egregious conduct uncovered might be referred to
courts-martial.  Nevertheless, they determined that "the absence of
warnings in an administrative investigation normally has no
drawbacks such a suppression of admissions."

2.   The IG report concedes that the investigators violated the law
and that the decision was ratified by the Secretary of the Navy,
the Chief of Naval Operations, the Judge Advocate General of the
Navy, the Navy General Counsel and the IG.  This knowing failure to
obey the requirements of Article 31, codified at 10 USC 831, is a
criminal offense punishable under Article 98 of the UCMJ.

3.   In conducting the interrogations, the agents used a variety of
coercive tactics, including screaming at the midshipmen, physically
challenging them, telling them they could not leave the
interrogation, telling them they did not have the right to remain
silent, that they had to talk with the investigators, refusing
requests to speak with counsel, threatening them with courts-
martial, and threatening that the agents would notify family
members of possible misconduct.  One midshipmen was initially
refused permission to attend a previously scheduled cancer
treatment.  The results of those interrogations are the statements
being offered in the cases before the Board.

4.   Each midshipman before the Board stands accused of violating
the Honor Concept.   Even assuming there is merit to the
allegations, there is no way to justify the wholesale suspension of
the midshipmen's Constitutional and statutory rights.   It is
reprehensible to reduce fundamental rights to nothing more than a
mere evidentiary barrier.  If those rights are to have any meaning
at all, they must be upheld every time they are trampled.

Encl

5.    For  the  above  reasons,  I  respectfully  object  to  the consideration  of  these  statements  and  ask  that  they  not  be considered.

NANCY A. SINCLAIR

FEB 17 1994

17 Feb 94

From:   LT Nancy A. Sinclair, JAGC, USN, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO CONSIDERATION BY THE HONOR BOARD OF STATEMENTS
        TAKEN IN VIOLATION OF ARTICLES 31 AND 98 OF THE UCMJ ICO
        MIDSHIPMAN FIRST CLASS SEAN WHITLATCH

1.  I respectfully object to the consideration of all statements taken by the Naval Inspector General agents on the grounds that the IG, in contravention of clear statutory language, made a calculated decision to violate Articles 31 and 98 of the Uniform Code of Military Justice by willfully and intentionally failing to inform midshipmen of the right to remain silent.  The investigators knew and understood that each midshipman was suspected of violating the Honor Concept, and hence, Article 133 of the Uniform Code of Military Justice.  The IG report makes it clear that even before the interrogations were conducted, the IG understood that particularly egregious conduct uncovered might be referred to courts-martial.  Nevertheless, they determined that "the absence of warnings in an administrative investigation normally has no drawbacks such a suppression of admissions."

2.  The IG report concedes that the investigators violated the law and that the decision was ratified by the Secretary of the Navy, the Chief of Naval Operations, the Judge Advocate General of the Navy, the Navy General Counsel and the IG.  This knowing failure to obey the requirements of Article 31, codified at 10 USC 831, is a criminal offense punishable under Article 98 of the UCMJ.

3.  In conducting the interrogations, the agents used a variety of coercive tactics, including screaming at the midshipmen, physically challenging them, telling them they could not leave the interrogation, telling them they did not have the right to remain silent, that they had to talk with the investigators, refusing requests to speak with counsel, threatening them with courts-martial, and threatening that the agents would notify family members of possible misconduct.  One midshipmen was initially refused permission to attend a previously scheduled cancer treatment.  The results of those interrogations are the statements being offered in the cases before the Board.

4.  Each midshipman before the Board stands accused of violating the Honor Concept.  Even assuming there is merit to the allegations, there is no way to justify the wholesale suspension of the midshipmen's Constitutional and statutory rights.  It is reprehensible to reduce fundamental rights to nothing more than a mere evidentiary barrier.  If those rights are to have any meaning at all, they must be upheld every time they are trampled.

5.     For the above reasons, I respectfully object to the consideration of these statements and ask that they not be considered.

NANCY A. SINCLAIR

*116*

FEB 17 1994

17 Feb 94

From:  LT Nancy A. Sinclair, JAGC, USN, Defense Counsel
To:    Rear Admiral Richard C. Allen, USN

Subj:  OBJECTION TO CONSIDERATION BY THE HONOR BOARD OF STATEMENTS
       TAKEN IN VIOLATION OF ARTICLES 31 AND 98 OF THE UCMJ ICO
       MIDSHIPMAN FIRST CLASS LIONEL G. HINES

1.  I respectfully object to the consideration of all statements
taken by the Naval Inspector General agents on the grounds that the
IG, in contravention of clear statutory language, made a calculated
decision to violate Articles 31 and 98 of the Uniform Code of
Military Justice by willfully and intentionally failing to inform
midshipmen of the right to remain silent.  The investigators knew
and understood that each midshipman was suspected of violating the
Honor Concept, and hence, Article 133 of the Uniform Code of
Military Justice.  The IG report makes it clear that even before
the interrogations were conducted, the IG understood that
particularly egregious conduct uncovered might be referred to
courts-martial.  Nevertheless, they determined that "the absence of
warnings in an administrative investigation normally has no
drawbacks such a suppression of admissions."

2.  The IG report concedes that the investigators violated the law
and that the decision was ratified by the Secretary of the Navy,
the Chief of Naval Operations, the Judge Advocate General of the
Navy, the Navy General Counsel and the IG.  This knowing failure to
obey the requirements of Article 31, codified at 10 USC 831, is a
criminal offense punishable under Article 98 of the UCMJ.

3.  In conducting the interrogations, the agents used a variety of
coercive tactics, including screaming at the midshipmen, physically
challenging them, telling them they could not leave the
interrogation, telling them they did not have the right to remain
silent, that they had to talk with the investigators, refusing
requests to speak with counsel, threatening them with courts-
martial, and threatening that the agents would notify family
members of possible misconduct.  One midshipmen was initially
refused permission to attend a previously scheduled cancer
treatment.  The results of those interrogations are the statements
being offered in the cases before the Board.

4.  Each midshipman before the Board stands accused of violating
the Honor Concept.  Even assuming there is merit to the
allegations, there is no way to justify the wholesale suspension of
the midshipmen's Constitutional and statutory rights.  It is
reprehensible to reduce fundamental rights to nothing more than a
mere evidentiary barrier.  If those rights are to have any meaning
at all, they must be upheld every time they are trampled.

5.   For the above reasons, I respectfully object to the consideration of these statements and ask that they not be considered.

NANCY A. SINCLAIR

*107*

FEB 17 1994

17 Feb 94

From:  LT Nancy A. Sinclair, JAGC, USN, Defense Counsel
To:    Rear Admiral Richard C. Allen, USN

Subj:  OBJECTION TO CONSIDERATION BY THE HONOR BOARD OF STATEMENTS
       TAKEN IN VIOLATION OF ARTICLES 31 AND 98 OF THE UCMJ ICO
       MIDSHIPMAN FIRST CLASS CHRIS J. CLAIBORNE

1. I respectfully object to the consideration of all statements taken by the Naval Inspector General agents on the grounds that the IG, in contravention of clear statutory language, made a calculated decision to violate Articles 31 and 98 of the Uniform Code of Military Justice by willfully and intentionally failing to inform midshipmen of the right to remain silent. The investigators knew and understood that each midshipman was suspected of violating the Honor Concept, and hence, Article 133 of the Uniform Code of Military Justice. The IG report makes it clear that even before the interrogations were conducted, the IG understood that particularly egregious conduct uncovered might be referred to courts-martial. Nevertheless, they determined that "the absence of warnings in an administrative investigation normally has no drawbacks such a suppression of admissions."

2. The IG report concedes that the investigators violated the law and that the decision was ratified by the Secretary of the Navy, the Chief of Naval Operations, the Judge Advocate General of the Navy, the Navy General Counsel and the IG. This knowing failure to obey the requirements of Article 31, codified at 10 USC 831, is a criminal offense punishable under Article 98 of the UCMJ.

3. In conducting the interrogations, the agents used a variety of coercive tactics, including screaming at the midshipmen, physically challenging them, telling them they could not leave the interrogation, telling them they did not have the right to remain silent, that they had to talk with the investigators, refusing requests to speak with counsel, threatening them with courts-martial, and threatening that the agents would notify family members of possible misconduct. One midshipmen was initially refused permission to attend a previously scheduled cancer treatment. The results of those interrogations are the statements being offered in the cases before the Board.

4. Each midshipman before the Board stands accused of violating the Honor Concept. Even assuming there is merit to the allegations, there is no way to justify the wholesale suspension of the midshipmen's Constitutional and statutory rights. It is reprehensible to reduce fundamental rights to nothing more than a mere evidentiary barrier. If those rights are to have any meaning at all, they must be upheld every time they are trampled.

5.    For the above reasons, I respectfully object to the consideration of these statements and ask that they not be considered.

_____
NANCY A. SINCLAIR

FEB 17 1994

17 Feb 94

From:  LT Nancy A. Sinclair, JAGC, USN, Defense Counsel
To:    Rear Admiral Richard C. Allen, USN

Subj:  OBJECTION TO CONSIDERATION BY THE HONOR BOARD OF STATEMENTS
       TAKEN IN VIOLATION OF ARTICLES 31 AND 98 OF THE UCMJ ICO
       MIDSHIPMAN FIRST CLASS JOSEPH A. BUCK

1.   I respectfully object to the consideration of all statements
taken by the Naval Inspector General agents on the grounds that the
IG, in contravention of clear statutory language, made a calculated
decision to violate Articles 31 and 98 of the Uniform Code of
Military Justice by willfully and intentionally failing to inform
midshipmen of the right to remain silent.  The investigators knew
and understood that each midshipman was suspected of violating the
Honor Concept, and hence, Article 133 of the Uniform Code of
Military Justice.  The IG report makes it clear that even before
the interrogations were conducted, the IG understood that
particularly egregious conduct uncovered might be referred to
courts-martial.  Nevertheless, they determined that "the absence of
warnings in an administrative investigation normally has no
drawbacks such a suppression of admissions."

2.   The IG report concedes that the investigators violated the law
and that the decision was ratified by the Secretary of the Navy,
the Chief of Naval Operations, the Judge Advocate General of the
Navy, the Navy General Counsel and the IG.  This knowing failure to
obey the requirements of Article 31, codified at 10 USC 831, is a
criminal offense punishable under Article 98 of the UCMJ.

3.   In conducting the interrogations, the agents used a variety of
coercive tactics, including screaming at the midshipmen, physically
challenging them, telling them they could not leave the
interrogation, telling them they did not have the right to remain
silent, that they had to talk with the investigators, refusing
requests to speak with counsel, threatening them with courts-
martial, and threatening that the agents would notify family
members of possible misconduct.  One midshipmen was initially
refused permission to attend a previously scheduled cancer
treatment.  The results of those interrogations are the statements
being offered in the cases before the Board.

4.   Each midshipman before the Board stands accused of violating
the Honor Concept.  Even assuming there is merit to the
allegations, there is no way to justify the wholesale suspension of
the midshipmen's Constitutional and statutory rights.  It is
reprehensible to reduce fundamental rights to nothing more than a
mere evidentiary barrier.  If those rights are to have any meaning
at all, they must be upheld every time they are trampled.

5.    For  the  above  reasons,  I  respectfully  object  to  the
consideration  of  these  statements  and  ask  that  they  not  be
considered.

_____
NANCY A. SINCLAIR

Ser J/58
18 FEB 94

From: Honor Review Board
To:     LT Coan, JAGC, USN

Subj:  OBJECTION TO ADMISSION OF STATEMENTS

Ref:    (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
        (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl:  (1)  Objection on behalf of Midshipman First Class Queen

1.  The Honor Review Board has received enclosure (1).  Under the rules governing Board proceedings, references (a) and (b), a midshipman accused of an honor violation will have an opportunity to object to the admissibility of evidence.  There is, however, no provision for legal counsel, a midshipman advisor, or any other person to make objections or other representations for a midshipman.

2.  Enclosure (1) is, therefore, returned.

F. J. PROCHAZKA
CDR, JAGC, USN
LEGAL ADVISOR

FEB 17 1994

15 Feb 94

From:   LT Geoffrey M. Coan, JAGC, USNR, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO CONSIDERATION BY THE HONOR BOARD OF STATEMENTS
        TAKEN IN VIOLATION OF ARTICLES 31 AND 98 OF THE UCMJ ICO
        MIDSHIPMAN FIRST CLASS TIMOTHY J. QUEEN


1.   I respectfully object to the consideration of all statements
taken by the Naval Inspector General agents on the grounds that the
IG, in contravention of clear statutory language, made a calculated
decision to violate Articles 31 and 98 of the Uniform Code of
Military Justice by willfully and intentionally failing to inform
midshipmen of the right to remain silent.  The investigators knew
and understood that each midshipman was suspected of violating the
Honor Concept, and hence, Article 133 of the Uniform Code of
Military Justice.  The IG report makes it clear that even before
the interrogations were conducted, the IG understood that
particularly egregious conduct uncovered might be referred to
courts-martial.  Nevertheless, they determined that "the absence of
warnings in an administrative investigation normally has no
drawbacks such a suppression of admissions."

2.   The IG report concedes that the investigators violated the law
and that the decision was ratified by the Secretary of the Navy,
the Chief of Naval Operations, the Judge Advocate General of the
Navy, the Navy General Counsel and the IG.  This knowing failure to
obey the requirements of Article 31, codified at 10 USC 831, is a
criminal offense punishable under Article 98 of the UCMJ.

3.   In conducting the interrogations, the agents used a variety of
coercive tactics, including screaming at the midshipmen, physically
challenging them, telling them they could not leave the
interrogation, telling them they did not have the right to remain
silent, that they had to talk with the investigators, refusing
requests to speak with counsel, threatening them with courts-
martial, and threatening that the agents would notify family
members of possible misconduct.  One midshipmen was initially
refused permission to attend a previously scheduled cancer
treatment.  The results of those interrogations are the statements
being offered in the cases before the Board.

4.   Each midshipman before the Board stands accused of violating
the Honor Concept.  Even assuming there is merit to the
allegations, there is no way to justify the wholesale suspension of
the midshipmen's Constitutional and statutory rights.  It is
reprehensible to reduce fundamental rights to nothing more than a
mere evidentiary barrier.  If those rights are to have any meaning
at all, they must be upheld every time they are trampled.

5.    For the above reasons, I respectfully object to the
consideration of these statements and ask that they not be
considered.


                        _Geoffrey M. Coan_
                        GEOFFREY M. COAN
                        LT    JAGC   USNR



HONOR REVIEW BOARD
UNITED STATES NAVAL ACADEMY
121 BLAKE ROAD
ANNAPOLIS, MARYLAND  21402-9976

Ser J/050
17 FEB 94

From:  Honor Review Board
To:    Lieutenant Christian L. Reismeier, JAGC, USN

Subj:  OBJECTION TO HONOR REVIEW BOARD PROCEEDINGS

Ref:   (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
       (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl:  (1) Objection on behalf of Midshipman First Class Barbosa
       (2) Objection on behalf of Midshipman First Class Bartis
       (3) Objection on behalf of Midshipman First Class Berger
       (4) Objection on behalf of Midshipman First Class Blake
       (5) Objection on behalf of Midshipman First Class Boran
       (6) Objection on behalf of Midshipman First Class Marks

1. The Honor Review Board has received enclosures (1) through (6).  Under the rules governing Board proceedings, references (a) and (b), a midshipman who is accused of an honor violation will have an opportunity to make objections, as are appropriate, to the President of the Board.  There is, however, no provision for legal counsel, a midshipman advisor, or any other person to make objections or other representations for a midshipman.

2. Enclosures (1) through (6) are, therefore, returned.

F.J. PROCHAZKA
CDR, JAGC, USN
Legal Advisor

Ser J/42
17 FEB 94

From:  Honor Review Board
To:    LT Coan, JAGC, USN

Subj:  OBJECTION TO ADMISSION OF STATEMENTS

Ref:   (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
       (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl:  (1)  Objection on behalf of Midshipman First Class Regan
       (2)  Objection on behalf of Midshipman First Class Patterson
       (3)  Objection on behalf of Midshipman First Class Ingrham
       (4)  Objection on behalf of Midshipman First Class Gwinn
       (5)  Objection on behalf of Midshipman First Class Barnes

1.  The Honor Review Board has received enclosures (1) through (5).  Under the rules
governing Board proceedings, references (a) and (b), a midshipman accused of an honor
violation will have an opportunity to object to the admissibility of evidence.  There is,
however, no provision for legal counsel, a midshipman advisor, or any other person to make
objections or other representations for a midshipman.

2.  Enclosures (1) through (5) are, therefore, returned.

F. J. PROCHAZKA
CDR, JAGC, USN
LEGAL ADVISOR

Ser J/43
17 FEB 94

From: Honor Review Board
To:    Captain D.P. Ingold, USMC

Subj:  OBJECTION TO ADMISSION OF STATEMENTS

Ref:   (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
       (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl:  (1) Objection on behalf of Midshipman First Class Barbour
       (2) Objection on behalf of Midshipman First Class Clark
       (3) Objection on behalf of Midshipman First Class Dermody
       (4) Objection on behalf of Midshipman First Class Fomoso
       (5) Objection on behalf of Midshipman First Class Hamilton
       (6) Objection on behalf of Midshipman First Class Marzetta
       (7) Objection on behalf of Midshipman First Class O'Neil
       (8) Objection on behalf of Midshipman First Class Pidgeon
       (9) Objection on behalf of Midshipman First Class Pirko
       (10) Objection on behalf of Midshipman First Class Sandell
       (11) Objection on behalf of Midshipman First Class Stramanak
       (12) Objection on behalf of Midshipman First Class Tate
       (13) Objection on behalf of Midshipman First Class Teff

1.  The Honor Review Board has received enclosures (1) through (13).  Under the rules
governing Board proceedings, reference (a) and (b), a midshipman accused of an honor
violation will have an opportunity to object to the admissibility of evidence.  There is,
however, no provision for legal counsel, a midshipman advisor, or any other person to make
objections or other representations for a midshipman.

2.  Enclosures (1) through (13) are, therefore, returned.

F.J. PROCHAZKA
CDR, JAGC, USN
LEGAL ADVISOR

Ser J/44
17 FEB 94

From: Honor Review Board
To:   LT Reismeier, JAGC, USN

Subj: OBJECTION TO ADMISSION OF STATEMENTS

Ref:  (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
      (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl: (1) Objection on behalf of Midshipman First Class Marks
      (2) Objection on behalf of Midshipman First Class Boran
      (3) Objection on behalf of Midshipman First Class Bartis
      (4) Objection on behalf of Midshipman First Class Barbosa
      (5) Objection on behalf of Midshipman First Class Berger
      (6) Objection on behalf of Midshipman First Class Blake

1.  The Honor Review Board has received enclosures (1) through (6).  Under the rules
governing Board proceedings, references (a) and (b), a midshipman accused of an honor
violation will have an opportunity to object to the admissibility of evidence.  There is,
however, no provision for legal counsel, a midshipman advisor, or any other person to make
objections or other representations for a midshipman.

2.  Enclosures (1) through (6) are, therefore, returned.

F.J. PROCHAZKA
CDR, JAGC, USN
LEGAL ADVISOR

Ser J/45
17 FEB 94

From: Honor Review Board
To:    LCDR Tinker, JAGC, USN

Subj:  OBJECTION TO ADMISSION OF STATEMENTS

Ref:   (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
       (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl:  (1) Objection on behalf of Midshipman First Class Stowers
       (2) Objection on behalf of Midshipman First Class Schneider
       (3) Objection on behalf of Midshipman First Class Mann
       (4) Objection on behalf of Midshipman First Class Bishop
       (5) Objection on behalf of Midshipman First Class Renda
       (6) Objection on behalf of Midshipman First Class Ingraham
       (7) Objection on behalf of Midshipman First Class Gantar
       (8) Objection on behalf of Midshipman First Class Duke
       (9) Objection on behalf of Midshipman First Class Blackmer

1.  The Honor Review Board has received enclosures (1) through (9).  Under the rules governing Board proceedings, references (a) and (b), a midshipman accused of an honor violation will have an opportunity to object to the admissibility of evidence.  There is, however, no provision for legal counsel, a midshipman advisor, or any other person to make objections or other representations for a midshipman.

2.  Enclosures (1) through (9) are, therefore, returned.

F. J. PROCHAZKA
CDR, JAGC, USN
LEGAL ADVISOR

Ex. 2



**DEPARTMENT OF THE NAVY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
200 STOVALL STREET
ALEXANDRIA, VA 22332-2400

IN REPLY REFER TO
JAGINST 5800.7C
JAG 133
3 OCT 90

<u>JAG INSTRUCTION 5800.7C</u>

From:  Judge Advocate General

Subj:  MANUAL OF THE JUDGE ADVOCATE GENERAL (JAGMAN)

Ref:   (a) 5 U.S.C. § 301
       (b) 10 U.S.C. §§ 801-940
       (c) Manual for Courts-Martial, United States, 1984 (MCM)

Encl:  (1) Manual of the Judge Advocate General
       (2) Summary of Significant Revisions

FILED

FEB 18 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

1.  <u>Purpose</u>.  To promulgate the <u>Manual of the Judge Advocate General</u> contained in enclosure (1) as authorized by the Secretary of the Navy.

2.  <u>Cancellation</u>.  JAG Instruction 5800.7B of 1 July 1978 is hereby cancelled; provided, however, that all those provisions contained in Chapter I of JAG Instruction 5800.7B and not contained in Chapter I of JAG Instruction 5800.7C shall continue in full force and effect until JAG Instruction 5810.2, Military Justice Regulations, is signed.

3.  <u>Scope</u>.  The JAGMAN contains regulations for the Department of the Navy that are issued under the authority of references (a) through (c) and other statutes and regulations.  It is a complete revision of the previous JAGMAN and should be read in its entirety.  Portions of the previous JAGMAN have been incorporated in separate JAG instructions with a limited distribution list. Enclosure (2) is a summary of revisions, including a side-by-side comparison of chapters and sections with the previous JAGMAN.  Major highlights include:

     a.  Reduced the number of chapters from 21 to 14 and added three new chapters on release of Government information, international law, and environmental protection.

     b.  Updated, reorganized, and modified Chapter I to comport with recent case law, to provide guidance regarding jurisdiction over reservists, to provide guidance on the exercise of court-martial jurisdiction after civilian trial, and to eliminate subject areas already adequately covered in the MCM or superseded by other instructions.

     c.  Streamlined the procedures and guidance for conducting administrative fact-finding investigations and consolidated the investigations chapter from six to one.  New guidance has been included regarding the conduct of investigations of major incidents.

     d.  Authorized field commands to retain set off authority for claims under Article 139 Investigations for $5,000.00 or less and eliminated the need to conduct a formal inquiry and provide the rights of a party to service-members accused of wrongful conduct.

CA 94-561

# MANUAL

# OF THE

# JUDGE   ADVOCATE   GENERAL



Office of the Judge Advocate General
Department of the Navy
200 Stovall Street
Alexandria, VA 22332-2400

# CHAPTER II

# ADMINISTRATIVE INVESTIGATIONS (FACT-FINDING BODIES)

## 0201   SCOPE

The Judge Advocate General is responsible for the administration, supervision, collection, storage, and release of investigations conducted by administrative fact-finding bodies under the provisions of this chapter.   Part A delineates the requirements for the convening, conducting, acting upon, and forwarding of these investigations; and Part B gives specific guidelines on investigations of specific types of incidents.   The characteristics and conduct of courts of inquiry and fact-finding bodies that require a hearing are set forth separately in JAGINST 5830.1.   Where JAGINST 5830.1 may conflict with this Manual, this Manual shall control.

## PART A -- GENERAL PROVISIONS

## 0202   GENERAL

### a.   Definitions

(1) Administrative fact-finding bodies. Administrative fact-finding bodies collect and record information.   Their reports are advisory. Their opinions, when expressed, do not constitute final determinations or legal judgments, and their recommendations, when made, are not binding upon convening or reviewing authorities.

(2) JAGMAN investigation.   An administrative fact-finding body constituted under any portion of the regulations set forth in this chapter.

(3) Major Incident.   An extraordinary incident occurring during the course of official duties resulting in multiple deaths, substantial property loss, or substantial harm to the environment where the circumstances suggest a significant departure from the expected level of professionalism, leadership, judgment, communication, state of material readiness, or other relevant standard.   Substantial property loss or other harm is that which greatly exceeds what is normally encountered in the course of day to day operations.   These cases are often accompanied by national public and press interest and significant congressional attention.   They may also have the potential of undermining public confidence in the Naval service.   That the case is a major incident may be apparent when it is first reported or as additional facts become known.

b. Function. The primary function of an administrative fact-finding body is to search out, develop, assemble, analyze, and record all available information about the matter under investigation.

c. Time limitations

(1) The convening authority prescribes the time period an administrative fact-finding body has to submit its investigation. This period shall not normally exceed 30 days from the date of the convening order. For good cause, however, the convening authority may extend the period. Requests and authorizations for extensions must be included as enclosures to the investigation.

(2) The convening authority and subsequent reviewers have 30 days to review the investigation. In death cases, the period for review is 20 days. Noncompliance with these time requirements must be explained in the endorsement of the deviating command. See MILPERSMAN 4210100 for the requirement to submit Status Investigation Reports.

2-7

d. Classification. Because of wide circulation of reports of investigation, classified information should be omitted unless inclusion is essential. When classified matter is included in the investigative report, the report shall be assigned classification of the highest subject matter contained therein. Encrypted versions of messages shall not be included or attached to investigative reports where the content or substance of such message is divulged.

e. Privacy Act compliance. Under the Privacy Act of 1974 (5 U.S.C. § 552a) and SECNAVINST 5211.5C, the following procedures shall apply to JAGMAN investigations:

(1) Advice required. When the Government requests an individual to supply personal information about himself in a statement to be maintained in a system of records, the individual shall be provided in duplicate a Privacy Act statement containing the particular information prescribed in SECNAVINST 5211.5C. The original is to be signed by the individual and appended to the record of the investigation. The individual retains the duplicate. If the information is requested in an interview or hearing, the Privacy Act statement should be orally summarized and explained to ensure that the individual fully understands it. The requirement for a Privacy Act statement is separate from other applicable warnings or advisements.

(2) "Personal information" defined. Personal information is information about an individual that is intimate or private to the individual, as distinguished from information related solely to the individual's official functions. It includes information pertaining to an individual's financial, family, social, and recreational affairs; medical, educational, employment, or criminal history; and information that identifies, describes, or affords a basis for inferring personal characteristics, such as finger or voice prints or photographs. It ordinarily does not include information associated with an individual's actions or inactions that are directly related to the duties of Federal employment or military assignment.

(3) "System of records" defined. A system of records is a group of records under the control of the Department of the Navy from which information is retrieved by the individual's name or some identifying number or symbol.

(4) Social Security numbers. A Privacy Act statement must be used if a member or employee is asked to voluntarily provide their Social Security number for a JAGMAN investigation. If Social Security numbers are obtained from other sources (e.g., service records), the individual need not be provided a Privacy Act statement. If Social Security numbers are obtained from other sources, this should be noted in the preliminary statement of the investigation. Social Security numbers should not be included in JAGMAN investigation reports unless they are necessary to precisely identify the individuals in question, such as in cases involving serious injury or death.

(5) Privacy Act statement contents. Appendix A-2-a contains proposed language that includes information required for a Privacy Act statement. Locally prepared forms in the format of Appendix A-2-a are authorized.

(6) Reviewing authorities. Prior to forwarding an investigative report to the Judge Advocate General, the officer exercising general court-martial jurisdiction will ensure compliance with the Privacy Act.

(7) Records of disclosures. Appendix A-2-b is recommended for use in recording and accounting for disclosures of information about identifiable individuals from records that are collected, used, or maintained under directives of the Judge Advocate General. Local reproduction is authorized.

0203   NEED AND IMPORTANCE

a. Efficient command and administration. Collection and preservation of information by fact-finding bodies assist convening and

appointing order must be in official letter form addressed from the convening authority to the senior member of a board or to the investigating officer of a one-officer investigation. When circumstances warrant, an investigation may be convened by oral or message order. Signed, written confirmation of oral or message orders must be issued in each case and included in the investigative report.

c. Contents of appointing order. The order must recite the specific purposes of the inquiry and contain explicit instructions about its scope; direct the fact-finding body to report findings of fact (it may also require opinions and recommendations); and contain directions for complying with the Privacy Act, Article 31, UCMJ, and section 0215b. If litigation by or against the United States is reasonably possible for an incident under investigation, the appointing order and preliminary statement of the investigative report must contain the following language: "This investigation is [appointed] [being conducted and this report is being prepared] in contemplation of litigation and for the express purpose of assisting attorneys representing interests of the United States in this matter. You will contact [the Judge Advocate providing legal support] for direction and guidance as to those matters pertinent to the anticipated litigation". This language is necessary when the investigation is being prepared in anticipation of litigation because portions of the investigation may be exempt from disclosure under Freedom of Information Act exemption (b)(5) and are normally privileged from discovery in litigation under the attorney work product privilege. 5 U.S.C. § 552(b)(5). Sample appointing orders are in appendices A-2-c and A-2-d.

d. Amendments. A convening authority may amend an appointing order at any time to change membership, limit or increase the scope of the inquiry, or provide additional instructions. During the investigation, if it appears to the fact-finding body that the convening authority might consider it advisable to enlarge, restrict, or modify the scope of the inquiry or to change in any material respect an instruction provided in the appointing order, a report shall be made to the convening

authority. The convening authority may take any action on this report deemed appropriate. The fact-finding body is considered dissolved when its duties have been completed, and no formal order to that effect is necessary.

e. Administrative support and experts. For timely completion of an investigation, a convening authority may appoint reporters and interpreters and authorize other assistance. Moreover, persons with technical knowledge may be appointed for either full participation or the limited purpose of utilizing their special expertise. If appointed for a limited purpose, they need not participate in any aspect of the inquiry not concerning their expertise. The investigative report must clarify any limited participation by a member.

## 0212   OATHS

a. General. Neither a one-officer investigation nor members of a fact-finding body not required to conduct a hearing need be sworn.

b. Administration of oaths. Although normally not required, a person on active duty appointed to perform investigative functions for a fact-finding body not requiring a hearing is empowered to administer the following oaths in the performance of duties:

(1) For reporters--"Do you swear (or affirm) that you will faithfully perform the duties of reporter for this proceeding (so help you God)?";

(2) For interpreters--"Do you swear (or affirm) that you will faithfully perform the duties of interpreter for this proceeding (so help you God)?"; and

(3) For witnesses--"Do you swear (or affirm) that the evidence you shall give in the matter now under investigation shall be the truth, the whole truth, and nothing but the truth (so help you God)?".

## 0213   PROOF OF FACTS--STANDARD OF PROOF

a. Underline{General}. A fact-finding body is not bound by formal rules of evidence applicable to courts-martial. It may use the most effective methods for collecting, analyzing, and recording all relevant information and may include in its investigative report any matter that a person of average caution would consider to be believable or authentic. A fact-finding body may assign certain issues, witnesses, or specific matters to individual members for investigation, holding later meetings to review the information collected for completeness. Additionally, it may call witnesses to present testimony before assembled members, or it may obtain information by personal interview, correspondence, telephone inquiry, or other means.

b. <u>Burden of proof</u>.

(1) <u>Preponderance of evidence</u>. Except for facts of which a court may take judicial notice, an administrative fact-finding body shall not arrive at findings of fact that are not supported by a preponderance of the evidence. A preponderance, that can be supported by evidentiary enclosures or personal observations, is created when the greater weight of guidance, or evidence that is more credible and convincing to the mind is offered in support, rather than opposition to any given fact. The weight of evidence in favor of establishing a particular fact is insufficient, unless it overbears, in some degree, the weight upon the other side. Weight of evidence in favor of establishing a particular fact is not to be determined by the sheer number of witnesses or volume of evidentiary matter presented on either side, but by that evidence that best accords with reason and probability.

(2) <u>Clear and convincing</u>. In order to rebut the presumption that an injury or disease has been incurred in the line of duty, to rebut the presumption of mental responsibility when the question of a member's mental responsibility has been raised by the facts or by the nature of the incident, or to find that the acts of a deceased service member may have caused harm and/or loss of life, including his own, through intentional acts, findings of fact relating to those issues must be established by

clear and convincing evidence. Clear and convincing means a degree of proof beyond preponderance. It is proof that should leave no reasonable doubt in the mind of those considering the facts. It should create a firm belief or conviction. Clear and convincing is that degree of proof that is intermediate, being more than a preponderance, but not reaching the extent of such certainty as beyond any reasonable doubt.

c. <u>Evidence</u>. The fact-finding body may not speculate on the causes of an incident. Inferences drawn from evidentiary enclosures or personal observations, however, are permissible. For example, the fact-finding body may through observation or tangible evidence determine the likely course of conduct or chain of events relative to the subject of investigation. It would be in most cases irrelevant and improper for a fact-finding body to theorize about the thought processes of an individual that resulted in certain courses of conduct.

(1) To the extent consistent with mission requirements, the convening authority will ensure that all evidence is properly preserved and safeguarded until the investigation is complete and all relevant actions have been taken.

(2) <u>Tangible evidence</u>. Whenever the condition, location, or other characteristic of an item of tangible evidence is of value, include the item or a photograph, description, chart, map, or suitable reproduction in the investigative report. If an investigator or board member observes an item and gains relevant sense impressions, e.g., noise, texture, smells, or any other impression not adequately portrayed by a photograph, chart, map, or other representation, he should record those impressions and include them as an enclosure to the report.

(3) <u>Documentary evidence</u>. Documentary evidence includes records, documents, letters, diaries, reports, and statements.

c.  Witnesses and warnings

(1) Witnesses not suspected of misconduct or improper performance of duty. Ordinarily, witnesses should provide statements in informal interviews. They may be required, however, to provide recorded testimony under oath. Probing questions as to "who," "what," "where," "when," "how," and "why" should be pursued. To avoid irrelevant material or omission of important facts, an investigator may assist a witness in preparing a written statement. When an investigator takes an oral statement, it should be reduced to writing and signed by the witness or certified by the investigator to be an accurate summary or verbatim transcript. Care should be taken to ensure that any statement is phrased in the actual language of the witness.

(2) Witnesses suspected of an offense, misconduct, or improper performance of duty. Ordinarily, a fact-finding body should collect relevant information from all other sources before interviewing persons suspected of an offense, misconduct, or improper performance of duty. Before the interview, the member must be advised of Article 31, UCMJ, warnings. See Appendix A-1-m.

(3) To reduce the possibility that disclosure of witnesses' testimony may influence testimony of future witnesses a fact-finding body may direct witnesses subject to naval authority not to discuss their testimony. Witnesses not subject to naval authority may be requested not to discuss their testimony.

(4) Prior to being asked to provide any statement relating to the origin, incurrence, or aggravation of a disease or injury, the affected member shall be warned of the right not to make such a statement. Without this warning, the statement is invalid. See 10 U.S.C. § 1219 and section 0215b. Additionally, criminal investigative statements taken without this warning shall not be included in JAGMAN investigations. Where a statement relating to the origin, incurrence, or aggravation of a disease or injury is invalid, the member may be provided the warning and asked to reiterate

the statement. If the member elects to provide a statement, it may be included in the JAGMAN investigation.

0214  INVESTIGATIVE REPORT

a. General. Investigative reports shall be submitted in letter form. The report normally will consist of a preliminary statement, findings of fact, opinions, recommendations, and enclosures. Appendix A-2-e is a sample investigative report.

b. Preliminary statement. The preliminary statement informs convening and reviewing authorities that all reasonably available evidence was collected or is forthcoming and each directive of the convening authority has been met. After setting forth the nature of the investigation, the preliminary statement details difficulties encountered, limited participation by any member, and any other information necessary for a complete understanding of the case. See section 0211c for the preliminary statement required when litigation by or against the United States is possible. The itinerary of an investigator or board in obtaining information is not required. A preliminary statement does not eliminate the necessity for findings of fact. (Notwithstanding statements in both the subject line and the preliminary statement that the investigation involves an aircraft mishap and death of the pilot, findings of fact must describe the aircraft, time and place of the accident, identity of the pilot, and other relevant information.)

c. Findings of fact. Findings of fact must be as specific as possible as to times, places, persons, and events. Each fact shall be made a separate finding, and each finding shall reference each enclosure supporting it.

d. Opinions. Opinions are reasonable evaluations, inferences, or conclusions based on the facts found. Each opinion must reference each finding of fact supporting it.

e. Recommendations. A fact-finding body bases its recommendations on the nature of the facts found and opinions expressed. The

convening authority may require recommendations in general or limited subject areas. Unless directed by proper authority, a fact-finding body shall not notify an accused of recommended charges. (For recommendations pertaining to the issuance of punitive and nonpunitive letters, see section 0209c.)

f. Enclosures. The first enclosure is the signed, written appointing order or signed, written confirmation of an oral or message appointing order. Subsequent enclosures should contain all evidence developed by the investigation. Each statement, affidavit, transcript of testimony, photograph, map, chart, document, or other exhibit should be a separate enclosure. NISC investigations consist of the report of investigation (ROI) (the narrative summary portion) and enclosures. ROI's shall not be included in JAGMAN investigative reports. Unless a local NISC office indicates to the contrary, clearance is not required for inclusion of enclosures to the ROI in a JAGMAN investigative report. If necessary for a full understanding of the incident, the location of the ROI should be cross-referenced in the JAGMAN investigative report. Neither polygraph reports nor their results should be included in JAGMAN investigative reports. If essential for a complete understanding of the incident, the location of the polygraph report should be cross-referenced in the JAGMAN investigative report. Signatures of board members or the signature of a one-officer investigator on an investigative report letter shall authenticate all enclosures.

g. Signing and authentication

(1) The investigating officer, senior member or, in his absence, the next senior member of a fact-finding body must sign the investigative report.

(2) If there are two members of a fact-finding body and they cannot agree on findings of fact, opinions, or recommendations, the report must be signed by the senior member. In a signed, dissenting report, the other member shall state, with particularity, his opposition to the report. If a board consists of three or more members, the majority provides the report of the board, and the signed, dissenting report of any member or members is attached thereto.

## 0215  WHEN LINE OF DUTY/MISCONDUCT DETERMINATIONS ARE REQUIRED

a. General. Where a member of the naval service incurs a disease or injury that might result in a permanent disability or that results in the member's physical inability to perform duty for a period exceeding 24 hours (as distinguished from a period of hospitalization for evaluation or observation), findings concerning line of duty and misconduct must be made.

b. Warning required before requesting statements regarding disease or injury. Any person in the Armed Forces, prior to being asked to sign any statement relating to the origin, incurrence, or aggravation of any disease or injury that he has suffered, shall be advised of his right not to sign such a statement. See 10 U.S.C. § 1219. The spirit of this section will be violated if a person, in the course of a JAG Manual investigation, obtains the member's oral statements and reduces them to writing, unless the above advice was given first. Compliance with this section must be documented. See appendix A-2-f.

## 0216  WHY LINE OF DUTY/MISCONDUCT DETERMINATIONS

a. Extension of enlistment. An enlisted member of the naval service who is unable to perform his duties for more than one day because of intemperate use of drugs or alcohol or because of disease or injury resulting from his misconduct is liable, after his return to duty, to serve for a period, that when added to the period that he served before his absence from duty, amounts to the term for which he was enlisted or inducted. 10 U.S.C. § 972.

Ex. 3



HONOR REVIEW BOARD
UNITED STATES NAVAL ACADEMY
121 BLAKE ROAD
ANNAPOLIS, MARYLAND  21402-9976

**FILED**    Ser J/056
18 FEB 94
**FEB 18 1994**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

From:   Honor Review Board
To:     Lieutenant Christian L. Reismeier, JAGC, USN

Subj:   OBJECTION TO LACK OF COUNSEL BEFORE THE HONOR REVIEW
        BOARD

Ref:    (a) Honor Review Board Precept (CNO ltr of 24 JAN 94)
        (b) Supplemental Guidance (CNO ltr of 28 JAN 94)

Encl:   (1) Objection on behalf of Midshipman First Class Barbosa
        (2) Objection on behalf of Midshipman First Class Bartis
        (3) Objection on behalf of Midshipman First Class Berger
        (4) Objection on behalf of Midshipman First Class Blake
        (5) Objection on behalf of Midshipman First Class Boran
        (6) Objection on behalf of Midshipman First Class Marks

1.    The Honor Review Board has received enclosures (1) through (6).  Under
the rules governing Board proceedings, references (a) and (b), a midshipman who
is accused of an honor violation will have an opportunity to make objections, as
are appropriate, to the President of the Board.  There is, however, no provision for
legal counsel, a midshipman advisor, or any other person to make objections or
other representations for a midshipman.

2.    Enclosures (1) through (6) are, therefore, returned.

F. J. PROCHAZKA
CDR, JAGC, USN
Legal Advisor

CA 94-261

*14* Feb 94

From:  LT Christian L. Reismeier, JAGC, USN, Defense Counsel
To:    Rear Admiral Richard C. Allen, USN

Subj:  OBJECTION TO LACK OF COUNSEL BEFORE HONOR REVIEW BOARD ICO
       MIDSHIPMAN FIRST CLASS *A. J. Barbour*

1.  I respectfully object to these proceedings on the grounds that
I am not being afforded the opportunity to represent my client
during his Honor Review Board.

2.  I met with Midshipman First Class *A. J. Barbour* and formed an
attorney-client relationship with him on *8 Feb 94*. He submitted
a request that I be present to represent him on *14 Feb 94*.

3.  By denying the right to representation before this Board, the
Navy will be acting in direct contravention of the Fifth Amendment.
The Naval Academy is subject to the Fifth Amendment, and as such,
Midshipman First Class *Barbour* should be accorded due
process before a separation proceeding.  The only separation
proceedings where there is no right to counsel that I am aware of
are those akin to the Midshipmen Honor Boards, where students are
judged by their peers.  The complexity of the cases and the
formality of the hearing process demands that Midshipman First
Class *Barbour* be afforded representation by his attorney.  I
therefore respectfully object to these proceedings on the grounds
that his due process rights are being violated.


                          CHRISTIAN L. REISMEIER

*14* Feb 94

From:   LT Christian L. Reismeier, JAGC, USN, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO LACK OF COUNSEL BEFORE HONOR REVIEW BOARD ICO
        MIDSHIPMAN FIRST CLASS _JOEL N BIRTH_

1.  I respectfully object to these proceedings on the grounds that
I am not being afforded the opportunity to represent my client
during his Honor Review Board.

2.  I met with Midshipman First Class _JOEL Birth_ and formed an
attorney-client relationship with him on _9 Feb 94_. He submitted
a request that I be present to represent him on _11 Feb 94_.

3.  By denying the right to representation before this Board, the
Navy will be acting in direct contravention of the Fifth Amendment.
The Naval Academy is subject to the Fifth Amendment, and as such,
Midshipman First Class _Birth_ should be accorded due
process before a separation proceeding.  The only separation
proceedings where there is no right to counsel that I am aware of
are those akin to the Midshipmen Honor Boards, where students are
judged by their peers.  The complexity of the cases and the
formality of the hearing process demands that Midshipman First
Class _Birth_ be afforded representation by his attorney.  I
therefore respectfully object to these proceedings on the grounds
that his due process rights are being violated.

_____

CHRISTIAN L. REISMEIER

*17* Feb 94

From:   LT Christian L. Reismeier, JAGC, USN, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO LACK OF COUNSEL BEFORE HONOR REVIEW BOARD ICO
        MIDSHIPMAN FIRST CLASS *Jason Reisser*

1.  I respectfully object to these proceedings on the grounds that
I am not being afforded the opportunity to actively represent my
client during his Honor Review Board.

2.  I met with Midshipman First Class *Reiss* and formed an
attorney-client relationship with him on *16 Feb 94*. He submitted
a request that I be present to represent him on *17 Feb 94*.

3.  By denying the right to actively representation before this
Board, the Navy will be acting in direct contravention of the Fifth
Amendment.  The Naval Academy is subject to the Fifth Amendment,
and as such, Midshipman First Class *Reiss* should be
accorded due process before a separation proceeding.  The only
separation proceedings where there is no right to counsel that I am
aware of are those akin to the Midshipmen Honor Boards, where
students are judged by their peers.  The complexity of the cases
and the formality of the hearing process demands that Midshipman
First Class *Reiss* be afforded representation by his attorney.
I therefore respectfully object to these proceedings on the grounds
that his due process rights are being violated.

CHRISTIAN L. REISMEIER

*16* Feb 94

From:   LT Christian L. Reismeier, JAGC, USN, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO LACK OF COUNSEL BEFORE HONOR REVIEW BOARD ICO
        MIDSHIPMAN FIRST CLASS *FLALE*_____

1.  I respectfully object to these proceedings on the grounds that
I am not being afforded the opportunity to actively represent my
client during his Honor Review Board.

2.  I met with Midshipman First Class *Blake*_____ and formed an
attorney-client relationship with him on *7 Feb 94*___.  He submitted
a request that I be present to represent him on *16 Feb 94*_.

3.  By denying the right to actively representation before this
Board, the Navy will be acting in direct contravention of the Fifth
Amendment.  The Naval Academy is subject to the Fifth Amendment,
and as such, Midshipman First Class *Blake*_____ should be
accorded due process before a separation proceeding.  The only
separation proceedings where there is no right to counsel that I am
aware of are those akin to the Midshipmen Honor Boards, where
students are judged by their peers.  The complexity of the cases
and the formality of the hearing process demands that Midshipman
First Class *Blake*_____ be afforded representation by his attorney.
I therefore respectfully object to these proceedings on the grounds
that his due process rights are being violated.

CHRISTIAN L. REISMEIER

2/17/94

*14* Feb 94

From:   LT Christian L. Reismeier, JAGC, USN, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO LACK OF COUNSEL BEFORE HONOR REVIEW BOARD ICO
        MIDSHIPMAN FIRST CLASS *Mike D. Barton*

1.   I respectfully object to these proceedings on the grounds that
I am not being afforded the opportunity to represent my client
during his Honor Review Board.

2.   I met with Midshipman First Class *Mike Barton* and formed an
attorney-client relationship with him on *8 Feb 94*.  He submitted
a request that I be present to represent him on *11 Feb 94*.

3.   By denying the right to representation before this Board, the
Navy will be acting in direct contravention of the Fifth Amendment.
The Naval Academy is subject to the Fifth Amendment, and as such,
Midshipman First Class *Barton* should be accorded due
process before a separation proceeding.   The only separation
proceedings where there is no right to counsel that I am aware of
are those akin to the Midshipmen Honor Boards, where students are
judged by their peers.   The complexity of the cases and the
formality of the hearing process demands that Midshipman First
Class *Barton* be afforded representation by his attorney.   I
therefore respectfully object to these proceedings on the grounds
that his due process rights are being violated.

CHRISTIAN L. REISMEIER

*᠇ Feb 94*

From:   LT Christian L. Reismeier, JAGC, USN, Defense Counsel
To:     Rear Admiral Richard C. Allen, USN

Subj:   OBJECTION TO LACK OF COUNSEL BEFORE HONOR REVIEW BOARD ICO
        MIDSHIPMAN FIRST CLASS  *D ʷⁱˢᵒⁿ MARKS*

1.  I respectfully object to these proceedings on the grounds that
I am not being afforded the opportunity to represent my client
during his Honor Review Board.

2.  I met with Midshipman First Class *Marks* and formed an
attorney-client relationship with him on *2 Feb 94*. He submitted
a request that I be present to represent him on *15 Feb 94*.

3.  By denying the right to representation before this Board, the
Navy will be acting in direct contravention of the Fifth Amendment.
The Naval Academy is subject to the Fifth Amendment, and as such,
Midshipman First Class *Marks* should be accorded due
process before a separation proceeding.  The only separation
proceedings where there is no right to counsel that I am aware of
are those akin to the Midshipmen Honor Boards, where students are
judged by their peers.  The complexity of the cases and the
formality of the hearing process demands that Midshipman First
Class *Marks* be afforded representation by his attorney.  I
therefore respectfully object to these proceedings on the grounds
that his due process rights are being violated.

                        CHRISTIAN L. REISMEIER

*JOS. III*
*1710*
*2/15/94*

Ex. 4

5800
17 Feb 94

**FILED**

**FEB 18 1994**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

From:  Lieutenant Commander J. E. King, JAGC, USN
To:    Naval Inspector General

Subj:  REQUEST FOR THE REMAINING 800 STATEMENTS COLLECTED DURING
       THE IG INVESTIGATION INTO THE COMPROMISE OF THE EE 311
       EXAM AT THE U.S. NAVAL ACADEMY WHICH OCCURRED IN DECEMBER
       1992

Ref:   (a)  LCDR J.E. King ltr 5800 dtd 26 Jan 94
       (b)  LCDR J.E. King ltr dtd 8 Feb 94
       (c)  CDR F.J. Prochazka ltr dtd 11 Feb 94 Pr
       (d)  Briefing to Defense Team by IG Agents O'Brien/Kellum
            at USNA on 31 Jan 94

Encl:  (1)  Affidavit from LCDR Tinker dtd 17 Feb 94
       (2)  Affidavit from LT Keller dtd 17 Feb 94
       (3)  Affidavit from LT Sinclair dtd 17 Feb 94

1.  Reference (a) requested copies of all statements,
attachments, notes assembled during subject investigation.  To
date, only a partial response has been received; the official IG
Report released on 20 January 1994.  Reference (b) requested the
additional 800 statements from the Honor Review Board which was
referred to your office by reference (c).

2.  The IG report makes reference to approximately 800 statements
taken from various people during the course of the investigation.
During a briefing session (reference d) the agents indicated that
all exculpatory material would be included in each midshipmans's
case file, if such material had been collected.  As indicated by
enclosures (1) through (3), exculpatory material is missing in at
least several cases.

3.  I am concerned that there is other exculpatory information
which exists, but has not come to the attention of myself or the
other attorneys.  I am requesting we be given these remaining
statements immediately to ascertain for ourselves if further
information exists which may assist our clients in presenting
their cases.

CA 94-361

Subj: REQUEST FOR THE 800 STATEMENTS COLLECTED BY THE IG
INVESTIGATION INTO THE COMPROMISE OF THE EE 311 EXAM AT
THE U.S. NAVAL ACADEMY WHICH OCCURRED IN DECEMBER 1992

4. The Honor Review Board is scheduled to begin hearing cases on
Wednesday 23 February 1994. Clearly, exculpatory statements are
relevant and could be a crucial determining factor in a
midshipman's board. Time is of the essence and your prompt
consideration and response is respectfully requested. I can be
reached at Mahan Hall, USNA, (410) 293-4357, 2268 or DSN: 281-
4357, 2268.

Very respectfully,

J. E. King

J. E. KING

DECLARATION OF LCDR JULIE L. TINKER, JAGC, USN

I am a defense counsel temporarily assigned to the Naval Legal
Service Office, National Capital, for the purpose of representing
midshipmen from the United States Naval Academy implicated in the
Fall 1992 EE311 cheating incident. In preparing my clients for
their honor boards, I have discovered that exculpatory statements
have not always been included in the package of evidence provided
to the midshipman and the members of the "Allen" board. In one
file, two statements made by one individual and one statement
made by another were not included. Another of my client's has
indicated that after he and a friend reviewed his file, the
friend noted that an exculpatory statement made by him was not
included. Requests have been made for those statements.

The fact that in some cases exculpatory statements have been
excluded is particularly disturbing as the defense team had been
assured by members of the Navy Investigator General's (Navy IG)
team who conducted the investigation, that incriminating AND
exculpatory evidence would be provided to the midshipmen and the
Honor Board members. Requests by defense counsel and the
midshipmen for copies of all eight hundred statements taken by
the Navy IG have not been granted as of this date. Discovering
whether or not there are exculpatory statements on a client is
hit or miss, and dependant on the individual who made the
statement mentioning that fact to the accused midshipmen.

I declare under penalty of perjury that the foregoing is true and
correct.

Executed on 17th day of February 1994.

JULIE L. TINKER
LCDR, JAGC, USN

## AFFIDAVIT OF LIEUTENANT KURT J. KELLER

I have been detailed as defense counsel for Midshipman 1C Kevin Havens who has authorized me to prepare this declaration.

Midshipman 1C Havens has been notified that the Honor Review Board will hear a charge that he has violated the Honor Concept of the Brigade of Midshipmen. The defense team has requested that the Naval Inspector General provide all statements taken in connection with their investigation. Instead, each Midshipman has been provided a package of the statements that apply to him as compiled by the Navy Inspector General.

It has come to my attention that the Inspector General may have left certain exculpatory statements out of the package that was provided to Midshipman Havens. Based on my investigation, I believe that the Inspector General interviewed and took statements from Midshipman 1C John Seigler, Haven's roommate, and ENS John Haase, a former teammate of Haven's on the basketball team. These statements may contradict evidence given by Midshipmen Larry Green and Mickey Walker which the government intends to introduce against Midshipman Havens. The defense needs these statements to properly prepare. There may be other exculpatory statements of which the defense is not aware.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 17th day of February 1994.

*K. J. Keller*

K.J. KELLER
LT JAGC USNR

Sworn and subscribed before me this 17th day of February 1994.

*Jeffrey M. Coan*

G. M. COAN
LT JAGC USNR

17 Feb 94

DECLARATION OF LT NANCY A. SINCLAIR, JAGC, USNR

I am a defense counsel temporarily assigned to the Naval Legal Service Office, National Capital, for the purpose of representing midshipman from the United States Naval Academy implicated in the Fall 1992 EE 311 cheating incident. In preparing my clients for their pending honor boards, I discovered that 4 exculpatory statements or results of interview were missing from the "Allen" board and midshipman package of one individual. These statements are pivotal in the defense of my client as they show that he never went to the room of Midn 1/C Chris Rounds on 13 December 1992, as a government witness claims. This is the only evidence, other than test analysis the government has linking my client to the compromise of the EE311 test. I have also been informed that another client's package was missing his roommate's exculpatory statement, which is pivotal to his defense as the statement will in essence serve as his alibi for the day of 13 December 1992. A request for these statements has been made.

The fact that in some cases exculpatory statements have been excluded is particularly disturbing, as the defense team has been assured by members of the Navy Investigator General's (Navy IG) team who conducted the investigation, that incriminating AND exculpatory evidence would be provided to the midshipmen and the Honor Board members. Requests by the defense counsel and the midshipmen for copies of all eight hundred statements taken by the Navy IG have not been granted as of this date. Discovering whether or not there are exculpatory statements on a client at this juncture is soles dependent upon whether or not the person who made the statement mentioned that fact to the accused midshipmen.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 17th day of February 1994.

NANCY A. SINCLAIR
LT, JAGC, USNR

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 1994 a copy of the foregoing Reply Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and in Opposition to Defendants' Motion to Dismiss was delivered by the means indicated to:

John Bates, Esquire                                    By Hand
Office of the United States Attorney
     for the District of Columbia
555 4th Street, N.W.
Room 3130
Washington, D.C. 20001

                                        Charles W. Gittins