UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIDSHIPMEN LANCE BARNES, et al. )
                                )
                 Plaintiffs,    )
                                )
        v.                      )   Civil Action No. ~~94-0216~~ ~~(HHG)~~
                                )                    94-261  SSH
HONORABLE JOHN DALTON, SECRETARY )
OF THE NAVY, et al.,            )
                                )
                 Defendants.    )
_____)

**FILED**

MAR 15 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### NOTICE OF FILING

Defendants note the filing herewith of the original

declarations of Admiral Frank B. Kelso, Vice Admiral David M.

Bennett, Rear Admiral Thomas C. Lynch, and Commander Frank J.

Prochazka, which were previously filed in facsimile form as

Defendants' Exhibits 1-4 in support of defendants' Motion to

Dismiss.[1]

Respectfully submitted,

ERIC H. HOLDER, JR., D.C. BAR #303115
United States Attorney

JOHN D. BATES, D.C. BAR #934927
Assistant United States Attorney

R. CRAIG LAWRENCE, D.C. BAR #171538
Assistant United States Attorney

MICHAEL J. RYAN, D.C. BAR #136294
Assistant United States Attorney

---

[1] Paragraph 9 of the Lynch Declaration reflects December 3
instead of November 22, 1993, a minor correction of a date that
does not affect the case or the positions of the parties.

/6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIDSHIPMAN LANCE BARNES,          )
et al.,                          )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )      Civil Action No. 94-0261 ~~HHG~~ SSH
                                 )
JOHN H. DALTON,                  )      **FILED**
SECRETARY OF THE NAVY,           )
et al.,                          )      MAR 1 5 1994
                                 )
            Defendants.          )      CLERK, U.S. DISTRICT COURT
                                        DISTRICT OF COLUMBIA

DECLARATION OF ADMIRAL FRANK B. KELSO II, U. S. NAVY,
CHIEF OF NAVAL OPERATIONS

      Pursuant to 28 U.S.C. § 1746, I, Admiral FRANK B. KELSO II,

U. S. Navy, Chief of Naval Operations, declare as follows:

Background

      1.  At all times pertinent to this action I was on active

duty in the grade of Admiral, serving as the Chief of Naval

Operations.

      2.  That from January 20, 1993, to July 22, 1993, I was

Acting Secretary of the Navy, and head of the Department of the

Navy.

      3.  On June 4, 1993, I signed a letter directing the Naval

Inspector General to inquire into the application of the Honor

System and the integrity of the examination process at the U.S.

Naval Academy with respect to allegations of honor violations

arising from the Fall Semester, 1992, final examination in the

course Electrical Engineering (EE 311).  Pursuant to Secretary of

the Navy Instruction 5430.57F, the Naval Inspector General is the



DEFENDANT'S
EXHIBIT

senior investigative official in the Department of the Navy and is the principal advisor to the Secretary and Chief of Naval Operations on all matters concerning inspections and investigations.  The Naval Inspector General's mission is to inspect, investigate, or inquire into any and all matters of importance to the Department of the Navy, with particular emphasis on readiness, including, but not limited to: effectiveness, efficiency, discipline, morale, ethics and integrity.  The Naval Inspector General is further responsible for investigation of command relationships and organizational structures, and is required to establish policy and procedures for the conduct of inquiries.

4.  As indicated by OPNAV Notice 5450 dated December 1, 1987, and the Standard Navy Distribution List, Part 2, Edition 73, dated March 1, 1990, the U.S. Naval Academy is a shore activity under the command of the Chief of Naval Operations.  At all times pertinent to this action, I, as Chief of Naval Operations, have been the direct military superior in the chain of command over the Superintendent, U.S. Naval Academy.

Authority and Responsibility of the Chief of Naval Operations

5.  Under 10 U.S.C. § 5033, in the performance of duties within the Department of the Navy, the Chief of Naval Operations takes precedence above all other officers of the naval service.

6.  Pursuant to U.S. Navy Regulations, 1990, which are endowed with the sanction of law, as to duty, responsibility, authority, distinctions and relationships of various commands,

2

officials and individuals, I, as Chief of Naval Operations, under Article 0405, am responsible to the Secretary of the Navy for the utilization of resources by, and the operating efficiency of, the Operating Forces of the Navy and assigned shore activities, including the U.S. Naval Academy.

7.  I, as Chief of Naval Operations, have been assigned specific responsibility under U.S. Navy Regulations, 1990, Article 0405, to inspect and investigate components of the Department of the Navy to determine and maintain efficiency, discipline, readiness, effectiveness and economy.

8.  Pursuant to Article 0405, I, under the direction of the Secretary of the Navy, exercise overall authority throughout the Department of the Navy in matters related to, among other things:

a. the effectiveness of the support of the Operating Forces of the Navy and assigned shore activities, including the U.S. Naval Academy, and;

b. matters essential to naval military administration, including discipline.

Naval Inspector General's Report

9.  In a report dated January 20, 1994, the Naval Inspector General described the results of his inquiry into compromise of the Fall Semester, 1992, Electrical Engineering examination.  The conclusions reached by the Naval Inspector General included that:

a.  "The Honor Board system in its current form was designed to handle individual cases.  The structure and procedures are not in place to handle a large volume of

3

interrelated cases."

b.  "There was no actual conflict of interest in the Commandant's handling of MIDN [        ]'s case.  However, there was a definite perception of a conflict or lack of impartiality among the midshipmen, and the Academy officials were not sensitive to this perception, nor is it evident they took any action to counter it."

c.  "The cases developed by the Naval Inspector General's investigation should not be referred to the Academy for action."

10.  In his report, the Naval Inspector General recommended:

a.  "That the cases developed by the Naval Inspector General's investigation be referred to a forum other than the Academy Honor Boards for resolution."

b.  "That, if the cases are referred to the Academy for disposition, the Superintendent and Commandant should recuse themselves from the review process in:  (1) any case involving midshipmen they have already rendered a decision on; and (2) any other case that could reasonably create the appearance of a conflict of interest or lack of impartiality."

11.  The Naval Inspector General described a sequence of events regarding the handling of the investigation and disposition of cases arising from the EE 311 examination which created the appearance, but not the fact, of preferential treatment of some midshipmen by the Superintendent.

4

## Action on the Report

12.   On the basis of the Naval Inspector General's report,
I, together with the Secretary of the Navy and the
Superintendent, U.S. Naval Academy, determined that, to ensure
fairness and impartial hearings for all midshipmen alleged to
have violated the Honor Concept, cases arising from the EE 311
examination should be processed through a non-adversarial
administrative fact-finding procedure that did not involve
members of the Class of 1994 sitting in judgment of their
classmates, and that the Commandant and Superintendent, U.S.
Naval Academy, should be removed from the process, except that
the Commandant and Superintendent should retain their normal
authority to impose a sanction short of discharge from the Naval
Academy in appropriate cases, as determined by a neutral and
detached decision-maker.

13.   On January 24, 1994, acting at the direction of the
Secretary of the Navy and upon the request of the Superintendent,
U.S. Naval Academy, I exercised my authority as the direct
military superior in the chain of command over the
Superintendent, U.S. Naval Academy, by relieving the
Superintendent of his responsibility under 10 U.S.C. § 6962 and
directing that cases arising from the EE 311 examination, not
dismissed or forwarded to the Commandant for imposition of a
sanction short of separation, be considered by an Honor Review
Board presided over by Rear Admiral Richard C. Allen, U. S. Navy.
See Attachment A.  This action recused the Superintendent from

his statutory role under 10 U.S.C. § 6962 for this category of cases under the Honor Concept, and substituted a separate neutral and detached decision-making process.

14.  My purpose in establishing the Honor Review Board was to ensure fairness and impartiality in the disposition of the cases arising from the EE 311 examination and to remove any appearance held by any members of the Brigade of Midshipmen that the Superintendent or Commandant might face a conflict of interest or lack impartiality in the disposition of any case arising from this incident, or any class of cases involving certain categories of midshipmen.

15.  I further agreed with the conclusion reached by the Naval Inspector General that the Honor Concept, as administered by midshipmen through Midshipman Honor Boards, was designed to handle individual cases involving relatively simple allegations of violation of the Honor Concept and was not designed to address multiple violations involving many interrelated cases which implicated a significant portion of the senior class.  The factors which influenced my decision to refer cases arising from compromise of the EE 311 examination to a forum other than Midshipman Honor Boards included allegations:

a.  that midshipmen conspired to obstruct the investigations into the incident and actively sought to coordinate their testimony by lying about their involvement, and that of their friends, with regards to the incident;

b.  that midshipmen were requested by their peers to

6

perjure themselves in testimony before Midshipman Honor Boards to protect their classmates, and that in a series of cases, the principal witness, who was a single individual, had perjured himself numerous times after being pressured to do so;

c. that some midshipmen who were honor board members, Midshipmen Honor Representatives, or members of the Brigade Honor Committee, were themselves implicated in the incident.

16. I further considered:

a. that the Naval Inspector General's report concluded that the majority of midshipmen interviewed did not feel truth was found, or even seriously sought, during the Midshipman Honor Boards' attempts to implement the Honor Concept at the Naval Academy;

b. that the burden on the Class of 1994, particularly the Brigade Honor Committee and the Midshipmen Honor Representatives (six of whom would normally be involved in each case, from an effective pool of 70), would be enormous, given that 133 cases were developed by the Naval Inspector General that warranted further review and considering the limited time remaining before graduation, and;

c. that hearings before Midshipman Honor Boards would compete with normal graduation requirements, including class preparation, academic examinations, pre-commissioning medical evaluations, athletics--in short, all aspects of a graduating midshipman's life.

17. I concurred with the Inspector General's report which

7

recommended that steps be taken to ensure that accused midshipmen were not judged by peers who might be inclined to find that a violation had been committed in order to vindicate the reputation of the Class of 1994.

18.  On February 1, 1994, the Superintendent, U.S. Naval Academy canceled the Naval Academy instruction pertaining to the Honor Concept, except Chapter 1, which contains the overarching definitions and principles of the system.

19.  No other cases will be processed under the procedures of the canceled instruction on the Honor Concept until a thorough review of the recommendations of the Board of Visitors' Report and the Naval Inspector General's report has been conducted and appropriate changes to the Honor Concept and its procedures have been incorporated.

<u>Investigative Procedures</u>

20.  While I was still Acting Secretary of the Navy, the Naval Inspector General discussed with me the techniques he intended to use to question midshipmen believed to have relevant knowledge of the facts regarding compromise of the examination. I determined at that time that those midshipmen suspected only of cheating (or lying about their having cheated) would not be prosecuted at courts-martial.  I communicated this determination to the Naval Inspector General and authorized him to so inform the midshipmen being questioned.  I specifically approved the Inspector General's plan to promise midshipmen suspected only of cheating (or lying about cheating) that they would not face

criminal prosecution.  To effect this end, I authorized the Naval Inspector General not to advise midshipmen suspected only of cheating (or lying about cheating) under Article 31, UCMJ.  I intended this to preclude the Department of the Navy from taking criminal action against midshipmen suspected only of cheating (or lying about having cheated).  This conformed with my interpretation of the pertinent Naval Academy instruction governing the Honor Concept, which stated that the right against self-incrimination did not apply to honor proceedings because there normally is no pending criminal charge or reasonable possibility of criminal prosecution.  My determination ensured that there could be no "reasonable possibility of criminal prosecution" with regards to midshipmen suspected of cheating, or lying about cheating.  In the event a midshipman was suspected of more than cheating, or if during questioning there arose suspicion of a greater degree of misconduct, I directed the Inspector General to provide appropriate rights warnings.

Honor Board Procedures

21.  I provided the Honor Review Board with guidance regarding the rights to be afforded midshipmen alleged to have violated the Honor Concept.  These rights are intended to satisfy fully the requirements of Constitutional Due Process, as it applies to non-adversarial administrative proceedings in an academic environment.

22.  Upon providing the midshipmen concerned with notice of the allegations against them, and a hearing in which they may

rebut those allegations by introduction of evidence and the testimony of available witnesses, the Honor Review Board will make its recommendations. The Honor Review Board has several options:

      a.  it may find that no violation occurred and dismiss the case;

      b.  it may find that a violation occurred, but that the circumstances warrant a sanction short of separation from the Naval Academy, and refer such cases to the Commandant;

      c.  or, it may find that a midshipman violated the Honor Concept and recommend that the midshipman be discharged from the Naval Academy.

    23.  Cases which result in a recommendation for discharge from the Naval Academy will be forwarded via me to the Assistant Secretary of the Navy (Manpower & Reserve Affairs).

    24.  The Secretary of the Navy, or his designee, will make the final determination within the Department of the Navy regarding whether a midshipman will be discharged, and any other related matters arising from such a discharge.

<u>Additional Honor Review Board Procedures</u>

    25.  The following modifications to the Honor Review Board's procedures will be included in the guidance regarding the rights to be afforded midshipmen in these cases:

      a.  First, one counsel for each midshipman will be allowed to be present in the hearing room and to confer with the midshipman in an advisory capacity. Such counsel will not be

10

allowed, however, to present the case or otherwise to address the Board during the proceedings. The presence and assistance of counsel are intended to avoid any source of discomfort to the midshipman from the disparity in rank between Board members and the midshipman.

b. Second, after all the evidence has been considered in a case, the Board members will decide whether or not a violation of the Honor Concept took place. If the members find that a violation did take place, they will decide at that time on what sanction to recommend in that case. After all of the cases are decided, the Board will review the sanctions (but not the findings of violation) in each case to ensure that they are consistent with one another. The Board does not intend to release the results of any case until all pending cases have been decided.

c. Third, if a midshipman raises as an issue the applicability of the Honor Concept's "21-day rule" to his or her case, the Board will decide that matter on a case-by-case basis.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 16, 1994, at The Pentagon, Arlington, Virginia.

_Frank B. Kelso II_
FRANK B. KELSO II
Admiral, U.S. Navy

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAR 1 5 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

MIDSHIPMAN LANCE BARNES )
<u>et al.</u>, )
                                )
            Plaintiffs, )
                                )  Civil Action No. 94-0261 (HHG)
JOHN H. DALTON, SECRETARY )
OF THE NAVY <u>et al.</u>, )
                                )
            <u>Defendants.</u> )

**DECLARATION OF VICE ADMIRAL DAVID M. BENNETT, U.S. NAVY,
NAVAL INSPECTOR GENERAL**

Pursuant to 28 U.S.C. §1746, I, Vice Admiral David M.
Bennett, U.S. Navy, hereby declare as follows:

1.  At all times pertinent to this action I was on active
duty in the grade of Vice Admiral, serving as the Naval Inspector
General.  I have been serving in this capacity since November,
1992.

2.  As the Naval Inspector General, I am a Staff Assistant
to the Secretary of the Navy ("Secretary") and I serve as
principle advisor to the Secretary, the Chief of Naval Operations
and the Commandant of the Marine Corps on all inspection and
investigation matters.  Under the direction of the Secretary, I
inspect, investigate, and inquire into any and all matters of
importance to the Department of the Navy with particular emphasis
on readiness, including, but not limited to effectiveness,
efficiency, economy and integrity.  To accomplish these
functions, I have unrestricted access, by any means, to any
information maintained by any naval activity deemed necessary.

DEFENDANT'S
EXHIBIT
2

3.  On June 7, 1993, I met with Admiral Frank B. Kelso, U.S. Navy, the Chief of Naval Operations ("CNO"), who was at the time also serving as the Acting Secretary of the Navy.  During that meeting, Admiral Kelso delivered to me a letter dated June 4, 1993, in which he directed me to conduct an official Inspector General investigation into the alleged compromise of the Electrical Engineering 311 ("EE 311") examination given on December 14, 1992, at the U.S. Navy Academy ("Academy").  Specifically, I was directed to investigate the application of the honor system and the integrity of the examination process at the Academy with respect to the allegations of honor violations arising from the Fall 1992, EE 311 final examination.

4.  After the meeting, I returned to my office and held a meeting with members of my staff.  We discussed Admiral Kelso's tasking, formed an investigative team and planned our initial investigative actions.  I requested that the Academy and the Naval Criminal Investigative Service ("NCIS") immediately terminate any investigations they had ongoing in this matter.  The newly formed investigative team immediately began gathering information on the alleged EE 311 compromise.

5.  As information was developed in the early stages of the investigation, the following began apparent:  (1) the number of midshipmen involved in the alleged compromise was considerably greater than the 24 who appeared before Honor Boards at the Academy in early 1993; (2) in order to meet the requirements of our assignment, it was necessary to determine the extent of the

cheating in connection with the Fall 1992 EE 311 examination; (3) in order to examine the effectiveness of the honor system and the integrity of the examination process, it was necessary to conduct an investigation designed to ensure maximum fact finding; and (4) based on his prior actions, the Superintendent had decided not to process any cases involving cheating under the Uniform Code of Military Justice ("UCMJ").

6.   I discussed with Admiral Kelso the techniques which I intended to employ in investigating the compromise.  I informed him that, based on the premise that midshipmen would not be subjected to disciplinary proceedings under the UCMJ, I did not intend to advise individual midshipmen of the provisions of Article 31(b) of the UCMJ.  The determination was made to conduct an administrative-type investigation vice a criminal-type one.  Such an approach, which is wholly consistent with all the investigations my office conducts, would significantly increase the likelihood of fully developing information regarding the compromise of the EE 311 examination, and the effectiveness of the Academy honor system.  My investigation was conducted on the basis that the midshipmen would not be subjected to disciplinary action under the UCMJ for cheating or lying.

7.   Although, the UCMJ disciplinary process would not be used for cheating or lying violations, Article 31(b) advisements would have been given before interviewing any midshipman suspected of violations such as theft, bribery, intimidation of witnesses, or breaking and entering.  No such evidence was ever

developed and, accordingly, Article 31(b) advisements were not warranted or given.

8. The Naval Inspector General Report of Investigation into the compromise of the Fall 1992 Electrical Engineering 311 examination at the Academy was submitted to the Secretary of the Navy on January 20, 1994. Attachment A to this declaration is a true and accurate copy of that Report of Investigation (with names of individual midshipmen redacted), without the enclosures thereto.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 16, 1994, at the Washington Navy Yard.


DAVID M. BENNETT
Vice Admiral, U.S. Navy
Naval Inspector General

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAR 1 5 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

MIDSHIPMAN LANCE BARNES,
et al.,                          )
                                 )
              Plaintiffs,        )
                                 )
v.                               )   Civil Action No. 94-0261 (HHG)
                                 )
JOHN H. DALTON, SECRETARY        )
OF THE NAVY, et al.,             )
                                 )
              Defendants,        )
_____)

DECLARATION OF REAR ADMIRAL THOMAS C. LYNCH, U.S. NAVY
SUPERINTENDENT, U.S. NAVAL ACADEMY

Pursuant to 28 U.S.C. §1746, I, Rear Admiral THOMAS C. LYNCH,

U.S. Navy, Superintendent, United States Naval Academy, declare

as follows:

1.  At all times pertinent to this action I was on active

duty in the grade of Rear Admiral, serving as the Superintendent

of the United States Naval Academy (Academy).

2.  On December 14, 1992, the Fall 1992 final examination for

Electrical Engineering 311 (EE 311) course was given at the

Academy.  The EE 311 course is a basic electrical engineering

course required for all non-engineering majors.  It is taken by

second class midshipmen, the equivalent of college juniors.

3.  Shortly after the EE 311 examination was given, some

1



DEFENDANT'S
EXHIBIT
3

midshipmen reported its possible compromise.  On December 16, 1992, I requested the Naval Criminal Investigative Service (NCIS) office to investigate the reports of the possible compromise.

4.  The NCIS investigation confirmed that the EE 311 examination had been compromised and eventually implicated thirty-nine (39) midshipmen.  Twenty-eight (28) of those midshipmen were processed under the Naval Academy's Honor Concept, and, ultimately, on May 10, 1993, I forwarded six (6) of those cases to the Secretary of the Navy with the recommendation that those midshipmen be separated from the Naval Academy.

5.  In June 1993, Admiral Kelso, the Chief of Naval Operations (CNO) and then Acting Secretary of the Navy, directed the Naval Inspector General (Naval IG) to conduct a further inquiry into the compromise.  Shortly thereafter, in August 1993, my Staff Judge Advocate received an initial assessment from the Naval IG investigators which indicated that over 100 midshipmen would be implicated in the compromise.  Based on the large number of cases that could require processing through the Naval Academy's Honor Concept, I reviewed the established procedures for administering Honor Boards, the Academy's primary mechanism for enforcing the Honor Concept.

6.  The Honor Concept of the Brigade of Midshipmen, developed in its current form in 1951, applies to all midshipman.  It

2

states that "[m]idshipmen are persons of integrity; they do not lie, cheat, or steal."  Attachment A to this declaration is a true and accurate copy of U.S. Naval Academy Instruction 1610.3E, issued on December 19, 1990, the Honor Concept of the Brigade of Midshipmen.

7.  Because of the large number of cases being prepared by the Naval IG for possible Honor Board review, of particular concern was my desire that these cases be handled in a fair, consistent and expeditious manner.  In keeping with this overriding goal, was the pressing concern that the large number of cases pending Honor Board resolution would tremendously overburden the midshipmen assigned as Honor Board members.  The midshipmen designated to sit as Honor Board members are also members of the Class of 1994, scheduled to graduate in May, 1994.

8.  I carefully balanced several factors before deciding upon a process that could handle the large number of honor board cases in a fair and consistent manner.  Among those factors were the relatively short period of time between the conclusion of the Naval IG's investigation, the issuance of his report and findings and the anticipated graduation date for the Class of 1994.  I considered the possible adverse implications of administrative hearings being conducted, but not completed, prior to the conclusion of final examinations or final service selection decisions.

3

9.  On December 3, 1993, I advised Admiral Kelso of my intention to process cases that arose from the Naval IG's investigation under the Honor Concept, with some modifications. Honor Concept proceedings were to be utilized for those matters referred to me for action by the Secretary of the Navy.

10.  On December 22, 1993, a committee formed by the Naval Academy Board of Visitors to review the Honor Concept published a report recommending that complex cases, such as large conspiracy cases involving honor offenses, be referred for a Judge Advocate General Manual investigation and/or a special board convened by the Superintendent.  The Board of Visitors noted that large numbers and complex cases could overwhelm the honor process.

11.  After consulting with my superiors, I concluded that a preliminary screening panel, consisting of senior naval personnel not currently connected with the Academy, should be convened in order to provide an impartial, fair and consistent review of the cases, while minimizing the negative effects on morale at the Academy.

12.  Three retired admirals were selected as members of the preliminary screening panel:  Admiral Leon Edney, U.S. Navy (Retired), Academy Commandant from June 1983 to January 1984; Vice Admiral William Lawrence, U.S. Navy (Retired), Academy Superintendent from August 1978 to August 1981; and Vice Admiral

4

Charles Minter, U.S. Navy (Retired), Academy Commandant from June 1961 to January 1964 and Superintendent from January 1964 to June 1965. No member of the panel was currently affiliated with the Naval Academy, but each was familiar with the Academy's regulations, procedures and, most importantly, the Honor Concept. Each member was senior in rank to me and the recommendations would be wholly independent of my responsibilities as Superintendent.

13. The Precept for the preliminary screening panel was issued on January 13, 1994. Attachment B to this declaration is a true and accurate copy of the Precept. The preliminary screening panel had no independent adjudicatory authority and its review was restricted to the individual case files developed by the Naval IG. The Naval IG referred 133 case files to the preliminary screening panel and the first set of files was received by the panel on January 15, 1994.

14. On January 20, 1994, the Naval IG released its report of investigation of the compromise of the EE 311 examination which included the recommendation that none of the cases developed by the Naval IG should be referred to the Academy for action. Based on that report, I recommended to the CNO that he convene an independent board of officers to receive the cases from the preliminary screening board and, on January 24, 1994, the CNO convened an Honor Review Board presided over by Rear Admiral

Richard Allen, U.S. Navy.  The Honor Review Board was designated as the administrative body that would receive and review those case files that otherwise would have been referred to a midshipman honor board.  Furthermore, based on the findings of the Naval IG, I requested to be recused from my responsibility under Title 10 U.S.C. §6962 to review and forward, with recommendations, these cases to the Secretary of the Navy.

15.  On January 27, 1994, the preliminary screening panel issued a decisional memorandum for the 133 cases referred by the Naval IG that it had reviewed.  The Brigade Honor Chairman received the cases the panel earmarked for termination because no allegation of an honor offense was warranted.  The Commandant received the case files for which honor violations were found but for which a sanction other than separation was recommended if the midshipman chose not to contest the finding of a violation.  I received one case file on a midshipman who graduated in May 1993 and forwarded that case file to his commanding officer for action as deemed appropriate.  Finally, the Honor Review Board received all case files for which the preliminary screening panel determined that all possible sanctions should be considered.

16.  On February 1, 1994, I canceled all provisions of the Naval Academy's Honor Concept, except for Chapter 1.  Attachment C is a true and accurate copy of the letter canceling the Honor Concept.

17.  On February 1, 1994, the Commandant received the case files and charges of all midshipmen whose cases had been referred to him for final determination.  Each midshipman whose case was referred to the Commandant by the preliminary screening panel has appeared before the Commandant.  All but two midshipmen pled guilty and were disciplined with sanctions short of separation. The two midshipmen who pled not guilty were referred to the Honor Review Board for further processing.

18.  It is my belief that on February 6, 1994, the Honor Review Board received the charges on midshipmen previously identified by the screening panel.

19.  The midshipmen currently before the Honor Review Board are first class midshipmen, the equivalent of college seniors. Their graduation is scheduled for May 25, 1994.  Based upon my experience as Superintendent of the Naval Academy, the time between now and graduation is a critical period during which the graduating Class of 1994 will be preparing for final examinations, graduation, and follow-on duty assignments.  These midshipman have been assigned to particular communities within the Navy, such as aviation, surface warfare, submarine warfare, etc., and assigned to duty billets throughout the Navy. Uncertainty as to the number and identity of midshipmen available to fill billets adversely effects the Navy's ability to effectively assign and rotate personnel and may cause over

touring for the billets they are slated to fill.

20.  Delay in the processing of these cases by the Honor
Review Board will not only adversely impact on the Navy's ability
to assign its personnel, but it will also harm the overall
maintenance of good order and discipline at the Naval Academy.
It is my belief that this matter will continue to have a
deleterious effect on the morale of the Academy until finally
resolved.

I declare under penalty of perjury that the foregoing is true
and correct.

Executed on February 16 , 1994, at the United States Naval
Academy, Annapolis, Maryland.

THOMAS C. LYNCH
Rear Admiral, U.S. Navy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MIDSHIPMAN LANCE BARNES,          )
    et al.                        )
                      )
        Plaintiffs,            )
                       )
       v.                       )    CIVIL ACTION NO. 94-0261 (HHG)
                       )
JOHN H. DALTON, SECRETARY OF     )
    THE NAVY,                    )
    et al.                        )
                       )
        Defendants.            )
                       )
_____

**FILED**

MAR 1 5 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

DECLARATION OF
COMMANDER FRANK J. PROCHAZKA, JAGC, USN

    Pursuant to 28 U.S.C. Section 1746, I, FRANK J. PROCHAZKA,
declare as follows:

    1.  I am a commander on active duty in the United States
Navy, and a member of the Judge Advocate General's Corps.  I am
an attorney, licensed to practice law.  I have been assigned as
legal advisor to the Honor Review Board that was convened to
consider the cases of individual midshipmen alleged to have
committed violations of the Honor Concept of the Brigade of
Midshipmen with regards to compromise of the Fall 1992 Electrical
Engineering 311 examination.

    2.  The Honor Review Board (the Board) was established by
the Chief of Naval Operations in a letter, referred to as the
"precept," dated January 24, 1994, with supplemental guidance
provided in a letter dated January 28, 1994.  The Board is
composed of five naval officers, none of whom are lawyers.

    3.  The Honor Review Board has been furnished with formal
charges alleging violations of the Honor Concept by 110

DEFENDANT'S
EXHIBIT
4

individuals.  Of these 110 individuals, 6 are no longer
midshipmen because they have been separated from the Naval
Academy for reasons unrelated to the function of the Honor Review
Board.  The Honor Review Board will not consider the cases of
these 6 individuals, leaving cases of 104 individual midshipmen
pending before the Honor Review Board.

4.  The Board will provide each midshipman concerned, who so
elects, a hearing.  The Board has not yet held any hearings, nor
has it considered any cases of midshipmen who elected not to have
a hearing before the Board.

5.  My principal function as legal advisor to the Board has
been to advise the Board on the general procedures for the
consideration of cases and conduct of hearings to ensure that the
rules established for the Board by the Chief of Naval Operations
are fully incorporated into Board procedures.  In particular, I
am responsible for providing advice and establishing procedures
to ensure compliance with pre-hearing, hearing, and post-hearing
rights of individual midshipmen.  I am also responsible for
maintenance of documents and records related to the Board, and
preparation of the reports of the Board including the record of
Board proceedings.

6.  Pursuant to the precept, the Board has been furnished
with formal charges of violation of the Honor Concept, together
with individual case files compiled by the Naval Inspector
General.  These same documents have been furnished to the
midshipmen.

7.  Board members, although not lawyers, have significant prior experience in conducting administrative, fact-finding and/or disciplinary hearings, at which individuals were afforded rights similar to those provided for in hearings before the Honor Review Board.  The Board will conduct hearings, in accordance with the precept, as amended.  I will not assist the Board in the presentation and receipt of evidence.  The President of the Board will rule on all objections to evidence, challenges to members, and other matters within his discretion.  I will be available if the President wishes to consult with me before making any ruling. I will be in the hearing room in order to administer oaths, to provide advice to the President if he desires, to oversee the recording of the proceedings and maintenance of documentary evidence, and to otherwise facilitate the efficient conduct of the hearing.

8.  I will not participate in individual case consideration, hearings, or deliberations.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 16, 1994, at Annapolis, Maryland.

_____
FRANK J. PROCHAZKA

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Notice of

Filing was mailed to:

> Charles W. Gittins, Esquire
> Williams & Connolly
> 725 12th Street, N.W.
> Washington, D.C.  20005

on this 15th day of March 1994.


JOHN D. BATES, D.C. BAR #934927
Assistant United States Attorney
Judiciary Center Bldg., Rm. 10-102
555 4th Street, N.W.
Washington, D.C.  20001
(202) 514-7151